# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISON

KIRK NIELSEN, MORGAN
OUTLAW, REVEL LUBIN, FELICIA
BRUCE, BARBARA DEVANE, RAY
DAVIS, DONESA JACKSON,
ALIANZA FOR PROGRESS, INC.,
FLORIDA ALLIANCE FOR
RETIRED AMERICANS, and
PRIORITIES USA,

              Plaintiffs,

          v.

RON DESANTIS, in his official
capacity as Florida Governor,
LAUREL M. LEE, in her official
capacity as Florida Secretary of State,
ASHLEY MOODY, in her official
capacity as Florida Attorney General,
THE FLORIDA ELECTIONS
CANVASSING COMMISSION, KIM
A. BARTON, in her official capacity as
Supervisor of Elections for ALACHUA
County, NITA CRAWFORD, in her
official capacity as Supervisor of
Elections for BAKER County, MARK
ANDERSEN, in his official capacity as
Supervisor of Elections for BAY
County, TERRY L. VAUGHAN, in her
official capacity as Supervisor of
Elections for BRADFORD County,
LORI SCOTT, in her official capacity
as Supervisor of Elections for
BREVARD County, PETER
ANTONACCI, in his official capacity

Case No. _____

**COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

1

as Supervisor of Elections for
BROWARD County, SHARON
CHASON, in her offical capacity as
Supervisor of Elections for CALHOUN
County, PAUL A. STAMOULIS, in his
official capacity as Supervisor of
Elections for CHARLOTTE County,
SUSAN A. GILL, in her official
capacity as Supervisor of Elections for
CITRUS County, CHRIS H.
CHAMBLESS, in his official capacity
as Supervisor of Elections for CLAY
County, JENNIFER J. EDWARDS, in
her official capacity as Supervisor of
Elections for COLLIER County,
ELIZABETH P. HORNE, in her
official capacity as Supervisor of
Elections for COLUMBIA County,
MARK F. NEGLEY, in his official
capacity as Supervisor of Elections for
DESOTO County, STARLET
CANNON, in her official capacity as
Supervisor of Elections for DIXIE
County, MIKE HOGAN, in his official
capacity as Supervisor of Elections for
DUVAL County, DAVID H.
STAFFORD, in his official capacity as
Supervisor of Elections for
ESCAMBIA County, KAITI
LENHART, in her official capacity as
Supervisor of Elections for FLAGLER
County, HEATHER RILEY, in her
official capacity as Supervisor of
Elections for FRANKLIN County,
SHIRLEY G. KNIGHT, in her official
capacity as Supervisor of Elections for
GADSDEN County, CONNIE
SANCHEZ, in her official capacity as
Supervisor of Elections for
GILCHRIST County, ALETRIS

FARNAM, in her official capacity as Supervisor of Elections for GLADES County, JOHN HANLON, in his official capacity as Supervisor of Elections for GULF County, LAURA HUTTO, in her official capacity as Supervisor of Elections for HAMILTON County, DIANE SMITH, in her official capacity as Supervisor of Elections for HARDEE County, BRENDA HOOTS, in her official capacity as Supervisor of Elections for HENDRY County, SHIRLEY ANDERSON, in her official capacity as Supervisor of Elections for HERNANDO County, PENNY OGG, in her official capacity as Supervisor of Elections for HIGHLANDS County, CRAIG LATIMER, in his official capacity as Supervisor of Elections for HILLSBOROUGH County, THERISA MEADOWS, in her official capacity as Supervisor of Elections for HOLMES County, LESLIE ROSSWAY SWAN, in her official capacity as Supervisor of Elections for INDIAN RIVER County, SYLVIA D. STEPHENS, in her official capacity as Supervisor of Elections for JACKSON County, MARTY BISHOP, in his official capacity as Supervisor of Elections for JEFFERSON County, TRAVIS HART, in his official capacity as Supervisor of Elections for LAFAYETTE County, ALAN HAYS, in his official capacity as Supervisor of Elections for LAKE County, TOMMY DOYLE, in his official capacity as Supervisor of Elections for LEE County, MARK EARLEY, in his official capacity as

Supervisor of Elections for LEON
County, TAMMY JONES, in her
official capacity as Supervisor of
Elections for LEVY County, GINA
MCDOWELL, in her official capacity
as Supervisor of Elections for
LIBERTY County, THOMAS
"TOMMY" R. HARDEE, in his
official capacity as Supervisor of
Elections for MADISON County,
MICHAEL BENNETT, in his official
capacity as Supervisor of Elections for
MANATEE County, WESLEY
WILCOX, in his official capacity as
Supervisor of Elections for MARION
County, VICKI DAVIS, in her official
capacity as Supervisor of Elections for
MARTIN County, CHRISTINA
WHITE, in her official capacity as
Supervisor of Elections for MIAMI-
DADE County, JOYCE GRIFFIN, in
her official capacity as Supervisor of
Elections for MONROE County,
VICKI P. CANNON, in her official
capacity as Supervisor of Elections for
NASSAU County, PAUL A. LUX, in
his official capacity as Supervisor of
Elections for OKALOOSA County,
DIANE HAGAN, in her official
capacity as Supervisor of Elections for
OKEECHOBEE County, BILL
COWLES, in his official capacity as
Supervisor of Elections for ORANGE
County, MARY JANE ARRINGTON,
in her official capacity as Supervisor of
Elections for OSCEOLA County,
WENDY SARTORY LINK, in her
official capacity as Supervisor of
Elections for PALM BEACH County,
BRIAN E. CORLEY, in his official

capacity as Supervisor of Elections for
PASCO County, DEBORAH CLARK,
in her official capacity as Supervisor of
Elections for PINELLAS County,
LORI EDWARDS, in her official
capacity as Supervisor of Elections for
POLK County, CHARLES
OVERTURF, in his official capacity as
Supervisor of Elections for PUTNAM
County, TAPPIE A. VILLANE, in her
official capacity as Supervisor of
Elections for SANTA ROSA County,
RON TURNER, in his official capacity
as Supervisor of Elections for
SARASOTA County, CHRIS
ANDERSON, in his official capacity as
Supervisor of Elections for
SEMINOLE County, VICKY OAKES,
in her official capacity as Supervisor of
Elections for ST. JOHNS County,
GERTRUDE WALKER, in her official
capacity as Supervisor of Elections for
ST. LUCIE County, WILLIAM KEEN,
in his official capacity as Supervisor of
Elections for SUMTER County,
GLENDA B. WILLIAMS, in her
official capacity as Supervisor of
Elections for SUWANNEE County,
DANA SOUTHERLAND, in her
official capacity as Supervisor of
Elections for TAYLOR County,
DEBORAH K. OSBORNE, in her
official capacity as Supervisor of
Elections for UNION County, LISA
LEWIS, in her official capacity as
Supervisor of Elections for VOLUSIA
County, HENRY WELLS, in his
official capacity as Supervisor of
Elections for WAKULLA County,
BOBBY BEASLEY, in his official

capacity as Supervisor of Elections for
WALTON County, CAROL F. RUDD,
in her official capacity as Supervisor of
Elections for WASHINGTON County,

Defendants.

Plaintiffs KIRK NIELSEN, MORGAN OUTLAW, REVEL LUBIN,

FELICIA BRUCE, BARBARA DEVANE, RAY DAVIS, DONESA JACKSON,

ALIANZA FOR PROGRESS, INC., FLORIDA ALLIANCE FOR RETIRED

AMERICANS, and PRIORITIES USA, (collectively, "Plaintiffs"), by and through

the undersigned attorneys, file this Complaint for Injunctive and Declaratory Relief

against Defendants RON DESANTIS, in his official capacity as Florida Governor,

LAUREL LEE, in her official capacity as Florida Secretary of State (the

"Secretary"), ASHLEY MOODY, in her official capacity as Florida Attorney

General, THE FLORIDA ELECTIONS CANVASSING COMMISSION, KIM A.

BARTON, in her official capacity as Supervisor of Elections for ALACHUA

County, NITA CRAWFORD, in her official capacity as Supervisor of Elections for

BAKER County, MARK ANDERSEN, in his official capacity as Supervisor of

Elections for BAY County, TERRY L. VAUGHAN, in his official capacity as

Supervisor of Elections for BRADFORD County, LORI SCOTT, in her official

capacity as Supervisor of Elections for BREVARD County, PETER

ANTONACCI, in his official capacity as Supervisor of Elections for BROWARD

County, SHARON CHASON, in her official capacity as Supervisor of Elections for CALHOUN County, PAUL A. STAMOULIS, in his official capacity as Supervisor of Elections for CHARLOTTE County, SUSAN A. GILL, in her official capacity as Supervisor of Elections for CITRUS County, CHRIS H. CHAMBLESS, in his official capacity as Supervisor of Elections for CLAY County, JENNIFER J. EDWARDS, in her official capacity as Supervisor of Elections for COLLIER County, ELIZABETH P. HORNE, in her official capacity as Supervisor of Elections for COLUMBIA County, MARK F. NEGLEY, in his official capacity as Supervisor of Elections for DESOTO County, STARLET CANNON, in her official capacity as Supervisor of Elections for DIXIE County, MIKE HOGAN, in his official capacity as Supervisor of Elections for DUVAL County, DAVID H. STAFFORD, in his official capacity as Supervisor of Elections for ESCAMBIA County, KAITI LENHART, in her official capacity as Supervisor of Elections for FLAGLER County, HEATHER RILEY, in her official capacity as Supervisor of Elections for FRANKLIN County, SHIRLEY G. KNIGHT, in her official capacity as Supervisor of Elections for GADSDEN County, CONNIE SANCHEZ, in her official capacity as Supervisor of Elections for GILCHRIST County, ALETRIS FARNAM, in her official capacity as Supervisor of Elections for GLADES County, JOHN HANLON, in his official capacity as Supervisor of Elections for GULF County, LAURA HUTTO, in her official capacity as

Supervisor of Elections for HAMILTON County, DIANE SMITH, in her official capacity as Supervisor of Elections for HARDEE County, BRENDA HOOTS, in her official capacity as Supervisor of Elections for HENDRY County, SHIRLEY ANDERSON, in her official capacity as Supervisor of Elections for HERNANDO County, PENNY OGG, in her official capacity as Supervisor of Elections for HIGHLANDS County, CRAIG LATIMER, in his official capacity as Supervisor of Elections for HILLSBOROUGH County, THERISA MEADOWS, in her official capacity as Supervisor of Elections for HOLMES County, LESLIE ROSSWAY SWAN, in her official capacity as Supervisor of Elections for INDIAN RIVER County, SYLVIA D. STEPHENS, in her official capacity as Supervisor of Elections for JACKSON County, MARTY BISHOP, in his official capacity as Supervisor of Elections for JEFFERSON County, TRAVIS HART, in his official capacity as Supervisor of Elections for LAFAYETTE County, ALAN HAYS, in his official capacity as Supervisor of Elections for LAKE County, TOMMY DOYLE, in his official capacity as Supervisor of Elections for LEE County, MARK EARLEY, in his official capacity as Supervisor of Elections for LEON County, TAMMY JONES, in her official capacity as Supervisor of Elections for LEVY County, GINA MCDOWELL, in her official capacity as Supervisor of Elections for LIBERTY County, THOMAS "TOMMY" R. HARDEE, in his official capacity as Supervisor of Elections for MADISON

8

County, MICHAEL BENNETT, in his official capacity as Supervisor of Elections for MANATEE County, WESLEY WILCOX, in his official capacity as Supervisor of Elections for MARION County, VICKI DAVIS, in her official capacity as Supervisor of Elections for MARTIN County, CHRISTINA WHITE, in her official capacity as Supervisor of Elections for MIAMI-DADE County, JOYCE GRIFFIN, in her official capacity as Supervisor of Elections for MONROE County, VICKI P. CANNON, in her official capacity as Supervisor of Elections for NASSAU County, PAUL A. LUX, in his official capacity as Supervisor of Elections for OKALOOSA County, DIANE HAGAN, in her official capacity as Supervisor of Elections for OKEECHOBEE County, BILL COWLES, in his official capacity as Supervisor of Elections for ORANGE County, MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for OSCEOLA County, WENDY SARTORY LINK, in her official capacity as Supervisor of Elections for PALM BEACH County, BRIAN E. CORLEY, in his official capacity as Supervisor of Elections for PASCO County, DEBORAH CLARK, in her official capacity as Supervisor of Elections for PINELLAS County, LORI EDWARDS, in her official capacity as Supervisor of Elections for POLK County, CHARLES OVERTURF, in his official capacity as Supervisor of Elections for PUTNAM County, TAPPIE A VILLANE, in her official capacity as Supervisor of Elections for SANTA ROSA County, RON TURNER, in his official capacity as

Supervisor of Elections for SARASOTA County, CHRIS ANDERSON, in his official capacity as Supervisor of Elections for SEMINOLE County, VICKY OAKES, in her official capacity as Supervisor of Elections for ST. JOHNS County, GERTRUDE WALKER, in her official capacity as Supervisor of Elections for ST. LUCIE County, WILLIAM KEEN, in his official capacity as Supervisor of Elections for SUMTER County, GLENDA B. WILLIAMS, in her official capacity as Supervisor of Elections for SUWANNEE County, DANA SOUTHERLAND, in her official capacity as Supervisor of Elections for TAYLOR County, DEBORAH K. OSBORNE, in her official capacity as Supervisor of Elections for UNION County, LISA LEWIS, in her official capacity as Supervisor of Elections for VOLUSIA County, HENRY WELLS, in his official capacity as Supervisor of Elections for WAKULLA County, BOBBY BEASLEY, in his official capacity as Supervisor of Elections for WALTON County, and CAROL F. RUDD, in her official capacity as Supervisor of Elections for WASHINGTON County, all in their official capacities as County Election Supervisors for their respective counties (collectively, "Supervisors"). Based upon information and belief, Plaintiffs allege as follows:

## NATURE OF THE CASE

1.      Plaintiffs bring this case to ensure that all eligible Florida voters have a fair and safe opportunity to exercise their right to vote in the August 18, 2020

primary ("August Primary") and November 3, 2020 general election ("November General"), as required by the U.S. Constitution. A novel coronavirus pandemic is sweeping through the country, with known infections exceeding a million and fatalities approaching 70,000. No states have been spared. In Florida, as of May 4, 2020, there are 36,078 confirmed cases, and 1,379 people have died; tragically, there is no end in sight to this crisis. Indeed, the Director of the Centers for Disease Control and Prevention ("CDC") recently cautioned that the country may encounter a second, more deadly wave of COVID-19, which will "be even more difficult than the one we just went through."[1]

2.      The pandemic's impact is not limited to Floridians' health; it also endangers their right to vote. The threat to Floridians' right to vote is so imminent that just weeks ago—still reeling from the challenges of administering the March 17, 2020 presidential preference primary election ("PPP") during the pandemic—all 67 of Florida's Supervisors of Elections laudably sent Governor DeSantis a letter outlining the challenges they will face in the upcoming August Primary and November General, as social distancing measures continue and unprecedented vote-by-mail turnout occurs. While Florida commendably allows widespread voting by mail, multiple laws and practices governing mail voting

---

[1] Zack Budryk, *CDC director warns second wave of coronavirus might be 'more difficult'*, THE HILL (Apr. 21, 2020), https://thehill.com/policy/healthcare/493973-cdc-director-warns-second-wave-of-coronavirus-might-be-more-difficult.

already burden and disenfranchise thousands of voters in the State and are certain to burden and disenfranchise thousands more in the current crisis without injunctive relief from this Court.

3.  On March 17, 2020, in the early stages of the pandemic, Florida held its PPP. While voters clad in gloves and masks waited to vote, county Supervisors witnessed significant challenges: polling places were unavailable, hand sanitizer and other materials were in short supply, and a substantial numbers of poll workers—most of whom were over 65 and at high risk for experiencing severe cases of COVID-19—decided not to work, many at the last minute. In Palm Beach County alone, over 800 poll workers backed out just shortly before the election due to coronavirus concerns. And shortly after the election, at least two poll workers in Broward County tested positive for COVID-19, at least one of whom was on duty for all nine days of early voting. The Supervisors anticipate that these challenges will persist in the August Primary and November General and, much like recent historic absentee turnout in Wisconsin, that Florida will see significant increases in voting by mail—much of it by first-time or new mail voters, given that most Florida voters have typically voted in person in past elections.

4.  But Florida's vote-by-mail regime is ill-equipped to handle this influx of new mail voters, which is certain to exacerbate the disenfranchising effects of Florida's failure to provide prepaid postage ("Vote-by-Mail Postage

Requirement"), its requirement that vote-by-mail ballots be received by 7 p.m. on Election Day ("Election Day Receipt Deadline"), Fla. Stat. Ann. §§ 101.67(2), 101.6103(2), 101.64, and its prohibition on the use of paid organizers to assist voters with collecting ballots ("Voter Assistance Ban"), Fla. Stat. Ann. § 104.0616 (collectively, "Challenged Provisions"). The burdens of the Challenged Provisions fall particularly heavily on Florida's elderly citizens, low-income citizens, and student voters, many of whom require assistance with delivering their ballots and do not have easy access to postage.

5.     Even under normal circumstances, Florida's Vote-By-Mail Postage Requirement, which dictates that voters pay for the postage necessary to mail their vote-by-mail ballot unless individual counties choose to take on that burden for them, significantly increases the monetary and transaction costs associated with voting. Not only must a mail voter pay for postage to vote, but they also must acquire the postage, which, in this digital age when many people do not keep stamps at home, often requires a trip to the post office or other essential business. For those with stamps, many voters must still determine the correct amount of postage, which varies by ballot size and weight. As a result, these voters are also forced to travel to local post offices to inquire about postage, which adds significant cost to the voting process, especially for those with limited access to transportation, including elderly citizens and students. These trips to the post office

also create risks of exposure to COVID-19, which is a concern for all voters and particularly for elderly voters in Florida who are especially vulnerable to the coronavirus. Moreover, as the United States Postal Service ("USPS") continues to face massive budget shortfalls and its workers themselves succumb to illness due to their exposure to coronavirus, there is no guarantee that voters' local post offices will be open and available to answer questions; it is all but certain that for many voters, the time used to acquire postage or determine the correct postage amount will delay the voting process and place voters at greater risk of disenfranchisement due to the Election Day Receipt Deadline.

6.      Similarly, Florida's Election Day Receipt Deadline disenfranchises thousands of voters who complete and mail their ballot prior to Election Day, but whose ballots—through no fault of the voter—do not arrive in the mail at their county Supervisor of Elections' Office by 7 p.m. on Election Day. *See* Fla. Stat. Ann. §§ 101.67(2), 101.6103(2), 101.64. In 2018 alone, Florida discarded over 17,000 ballots—nearly 56% of all vote-by-mail ballots that were rejected—simply because they arrived after the Election Day Receipt Deadline. More alarmingly, it did so notwithstanding that over 20,000 Florida voters did not even receive their mail ballot until just days before Election Day, leaving them with insufficient time to return it by mail through no fault of their own. While the Election Day Receipt Deadline is constitutionally problematic in its own right, under the current

circumstances—where a global pandemic will lead to a significant increase in mail voting while at the same time severely burdening an already compromised USPS and thinly stretched local elections staff—it cannot survive judicial scrutiny. If left in place, the Election Day Receipt Deadline is certain to disenfranchise countless more voters this fall and, as a result, necessitates the precise change that the U.S. Supreme Court accepted in Wisconsin for its recent primary election—a postmark deadline that requires counting all ballots postmarked on or before Election Day and received within a reasonable time after Election Day. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, 2020 WL 1672702, at *2 (Apr. 6, 2020).

7.      Finally, Florida's Voter Assistance Ban, codified at Fla. Stat. Ann. § 104.0616, also significantly raises the risk that large swaths of lawful, eligible voters—many of whom are likely to have limited mobility and limited access to mail—will be disenfranchised. The Voter Assistance Ban makes it a misdemeanor for any individual paid by any organization to assist with returning more than two vote-by-mail ballots each election, unless the individual is an immediate family member of the voter. The Voter Assistance Ban hamstrings the ability of organizations like Priorities USA and Alianza to assist voters and their constituents in making the transition to vote by mail and to ensure that voters' ballots arrive on time to be counted. This is particularly problematic for the upcoming elections, not

only because there will be a substantial increase in the number of individuals needing assistance with turning in their ballot, but also because it will be exceptionally difficult to find individuals unaffiliated with political organizations who are willing to volunteer to assist voters given COVID-19 and the public health risks of exposing themselves to other individuals.

8.     For decades, Florida has been ground zero for election mishaps. In 2000, the fate of the U.S. Presidency remained in limbo for over a month due to voting machine failures in Florida. In 2012, Florida made national headlines by having some of the longest voting lines in the country. And in 2018, Florida faced three statewide recounts—at least one of which could have been decided by the number of mail votes that were not counted because they arrived after the Election Day Receipt Deadline. While 2020 is certainly an unprecedented year, it does not have to be the next year on the long list of Florida's election debacles. This Court can help prevent that outcome by ensuring that Florida's vote-by-mail regime complies with the Constitution and provides a mechanism for all voters to vote in the upcoming elections.

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution and by an Act of Congress.

16

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

11.     This Court has personal jurisdiction because each of the Defendants resides in Florida, has continuous and systematic contact with Florida, and is subject to service of process in Florida in their official capacities. Among the Defendants, Governor Ron DeSantis, Secretary of State Laurel Lee, Attorney General Ashley Moody, and the Florida Election Canvassing Commission all reside and carry out a substantial amount of their official duties in within this judicial district, as do 23 of the Defendant Supervisors of Elections within their respective counties in this judicial district. The remaining 44 Defendant Supervisors reside and carry out substantially all of their official duties within their respective counties elsewhere in Florida.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because (1) all Defendants are residents of Florida, in which this judicial district is located, and numerous Defendants reside in this judicial district; and (2) a substantial part of the events that gave rise to Plaintiffs' claim occurred in this judicial district.

13.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

14.    All conditions precedent to the maintenance of this case and Plaintiffs' claims have occurred, been performed, or otherwise been waived.

## PARTIES

15.    Plaintiff KIRK NIELSEN is a U.S. citizen and a registered voter in Miami-Dade County, Florida. Nielsen is an investigative journalist and an adjunct professor at the University of Miami. Nielsen has been a registered voter in Florida for twenty-five years and regularly participates in elections. In the 2018 general election, Nielsen cast his vote-by-mail ballot via first class mail on October 29, 2018—eight days before Election Day—from a post office at the University of Miami's Coral Gables campus. Through public record requests that Nielsen submitted himself, Nielsen later learned that his ballot was not received by the Miami-Dade County Supervisor of Elections until November 14, 2018—sixteen days after sending in his ballot and eight days after Election Day. As a result, Miami-Dade County did not count Nielsen's ballot. Nielsen intends to participate in upcoming elections in Florida, and he wants his ballot to count. While Nielsen would prefer to vote in person given his prior experience with vote-by-mail ballots, Nielsen no longer feels comfortable voting in person during the coronavirus pandemic. Nielsen intends to cast a mail ballot in upcoming elections. As Nielsen's experience from the 2018 general election demonstrates, under Florida's current standard for counting ballots, there is a substantial risk that his ballot will not be

counted because it will not be received by his county by the Election Day Receipt Deadline. This risk exists even if Nielsen sends in his ballot well in advance of Election Day and in compliance with the guidance provided by both the USPS and the Miami-Dade Supervisors' office with respect to when ballots should be mailed.

16.     Plaintiff MORGAN OUTLAW is a U.S. citizen and a registered voter in Okaloosa County, Florida, the state where she was raised and where her family still resides today. For both the 2016 and 2018 general elections, while Outlaw was a student at Virginia Commonwealth University, she requested a mail ballot to vote. Outlaw sent back both ballots to Okaloosa County, Florida in advance of Election Day, but neither ballot was counted because those ballots did not reach the Supervisor's office until shortly after Election Day. The county did not notify her after either election to inform her that her ballot did not arrive on time. Today, Outlaw is obtaining her Masters in Disability Studies through the City University of New York. While she lives out of state, she still considers Florida to be her permanent home. Because Outlaw is immunocompromised and has limited mobility, she cannot easily travel home to vote, especially in light of the current COVID-19 pandemic. Outlaw intends to participate in upcoming elections in Florida, and she wants her ballot to count this time. Because Outlaw will be away from her home this upcoming Fall, she will need to cast a mail ballot again. Because Okaloosa County does not provide pre-paid postage for its vote-by-mail

ballots, Outlaw will be required to acquire and pay for postage in order to cast her ballot. And as Outlaw's experience from the prior two general elections shows, under Florida's current standard for counting ballots, there is a substantial risk that Outlaw's ballot will not be counted because it will not be received by her county by 7 p.m. on Election Day even if she sends in her ballot in advance of Election Day.

17.    Plaintiff REVEL LUBIN is a U.S. citizen and a registered voter in Florida, the state where he was raised and where his family still resides today. Since voting for the first time by mail in the 2018 general election, Lubin started a graduate program at Yale University, in New Haven, Connecticut, where he will be attending school during the 2020 Primary and General Elections. Although he will be attending school out of state, he still considers Florida to be his permanent home. Lubin is avoiding air travel in light of the current COVID-19 pandemic and has neither the financial resources nor the time to travel home to vote. Lubin intends to participate in upcoming elections in Florida and is concerned about whether his mail ballot will be counted, particularly with the time it takes under normal circumstances for mail deliveries between his home in Orlando, Florida and his temporary apartment in Connecticut; and the prospect of greater delay during the pandemic gives him further concern. Because Lubin will be away from home this upcoming Fall, he will need to cast a mail ballot again. Lubin does not

have a car at school, and the nearest post office, where he could verify collection of his mail ballot, is a 32-minute walk from his temporary apartment. With his demanding schedule, it is likely to take several days from when he receives his mail ballot until he can take his mail ballot to the post office. Under Florida's current standard for counting ballots, there is a substantial risk that Lubin's ballot will not be counted because it will not be received by his county by 7 p.m. on Election Day even if he sends in his ballot in advance of Election Day.

18.     Plaintiff FELICIA BRUCE is a U.S. citizen and a registered voter in St. Lucie County, Florida. Bruce is 70 years old, a retired school teacher, and a member of the Florida Alliance for Retired Americans. Since moving to Florida, Bruce has usually voted by mail so that she can volunteer during the election, which she has done during every election since she moved to Florida. On Election Day, Bruce typically serves as a volunteer poll watcher or poll worker or provides free transportation to the polls to other Florida voters. Before the pandemic, Bruce had signed up to be a poll worker again this year, but she no longer believes she will be able to serve as a poll worker because of concerns about exposing herself to coronavirus. Bruce has a pre-existing condition that places her at heightened risk for COVID-19. For that reason, Bruce does not feel it is safe to vote in person this year and will cast a mail ballot. Because St. Lucie County does not provide pre-paid postage for its vote-by-mail ballots, Bruce will be required to acquire and pay

for postage in order to cast her ballot. Bruce is also particularly concerned that the anticipated surge in mail voting will overwhelm the election Supervisor's staff and the postal service, leading to delays in delivery of mail ballots. She fears that her mail ballot will arrive after the Election Day Receipt Deadline as a result; she would be less at risk if Florida were required to count every mail ballot that is completed and mailed on or before Election Day.

19.    Plaintiff BARBARA DEVANE is a U.S. citizen and a registered voter in Leon County, Florida. She is 77 years old, a retired social studies teacher, and a member of the Florida Alliance for Retired Americans. Participating in elections is important to DeVane, and she usually tries to be the first person in line at her polling location in Tallahassee. DeVane strongly prefers to vote in person to ensure that her ballot is counted, but is concerned about voting in person this year due to the coronavirus pandemic. DeVane has a weakened immune system and worries that voting in person will expose her to the coronavirus. DeVane intends to vote by mail to protect her health. Because Leon County does not provide pre-paid postage for its vote-by-mail ballots, DeVane will be required to acquire and pay for postage in order to cast her ballot. And because DeVane has experienced mail delays in the past, she is concerned that she will experience similar delays this year, and that her mail ballot will arrive late and not be counted. She fears both that her ballot may not arrive at her home with enough time for her to mail it back and that there will

be delay when she sends it to the local election office. DeVane strongly believes her ballot should count as long as it is postmarked by Election Day. Because DeVane does not like to gamble with her ballot, DeVane would also utilize a ballot collection service to have a trusted person personally deliver her ballot for her, if such a service were available to her.

20.     Plaintiff RAY DAVIS is a U.S. citizen and registered voter in Pinellas County, Florida. Davis is 76 years old, a retired auto worker, and a member of the Florida Alliance for Retired Americans. Voting is important to Davis, who usually casts his ballot by personally hand-delivering his mail ballot to his local elections office or by driving his ballot to a drop-off location. Due to the coronavirus pandemic, however, Davis does not want to take the unnecessary risk of venturing out to cast his ballot, particularly because his wife has pre-existing conditions, which make her vulnerable to the disease. As a result, Davis intends to rely on the mail to cast is ballot this year. Because Pinellas County does not provide prepaid postage, Davis must acquire and pay for postage before he can return his vote-by-mail ballot. Davis is also particularly concerned that his ballot will not be counted if it is not received by his Supervisors' office by the Election Day Receipt Deadline. Davis does not want to choose between his family's health and ensuring that his vote counts. He would be more confident that his ballot would be counted if Florida were required to count ballots postmarked by Election Day. In addition,

Davis is concerned about fellow members of the Alliance, many of whom are 70-80 years old and at heightened risk for coronavirus. He has been encouraging them to vote by mail as well and wants to make sure that all of them have a fair opportunity for their ballots to be sent and counted. In particular, he knows that many do not have stamps and will have to obtain them to vote, which is an additional step that might put them at risk and potentially delay their ballot from being sent and arriving on time.

21.    Plaintiff DONESA JACKSON is a U.S. citizen and a registered voter in Seminole County, Florida. Jackson is 82 years old, a retired teacher, and a member of the Florida Alliance for Retired Americans. Voting is extremely important to Jackson; she believes that she has voted in every election since she has been registered to vote. Jackson intends to vote by mail this year and would not feel safe voting in person. Jackson believes she is particularly at risk for developing severe complications should she contract coronavirus given her age, her asthma, and the fact that she is immunocompromised. For that same reason, while Jackson usually purchases stamps from the post office, she no longer feels comfortable putting herself at risk to do so. And, because Seminole County does not provide prepaid postage, Jackson must acquire and pay for postage before she can return her vote-by-mail ballot. Jackson would utilize a ballot collection service to have a trusted person personally deliver her ballot for her, if such a service were

available to her. Jackson knows these services are essential to help voters cast their ballots, as she herself used to assist her friends with returning their ballots when they had no other means to do so. If such services are not available, Jackson will mail her ballot, but she is worried her ballot will not be counted if it is not received by her Supervisor's Office until after the Election Day Receipt Deadline.

22.    Plaintiff ALIANZA FOR PROGRESS, INC. ("Alianza") is a nonpartisan political organization dedicated to uniting the Puerto Rican and Hispanic population in the state of Florida and developing leaders from within the community that will support progressive policies.  To accomplish those goals, Alianza is active in, and dedicated to, enabling and protecting the rights of voters, especially with the Puerto Rican and Hispanic population, who are at elevated risk of disenfranchisement because of the language barriers, recent migration, economic disadvantage, and other structural barriers to effective political speech and association.

23.    Alianza runs field, digital organizing, and communications campaigns directed at Florida's Puerto Rican and Latinx communities, who are the core constituencies that Alianza exists and works to serve. In order to assist in advancing progressive policies and issues to improve the lives of its members and members of its voting constituencies, Alianza has engaged in efforts to educate its members and members of its voting constituencies about the voting process and to

assist them to effectively exercise their right to vote by properly registering to vote, understanding the means available to vote, and assuring that they cast and have their votes counted. But for the Voter Assistance Ban, Alianza would have its professional field staff, who are and would be compensated for their work, also work to collect and deliver mail ballots to the polls on behalf of its members and members of its voting constituencies.

24.    The age range of Alianza's members and members of its voting constituencies covers the entire range of voting-age population, from the elderly to newly eligible voters, who often live in multi-generational households that rely on mature adults working multiple jobs to support both aging parents and young children.  Many of these voters are economically disadvantaged recent migrants to Florida who speak limited or no English and face particular challenges in navigating the process to access and exercise their voting rights under the best of circumstances.   The current COVID-19 Pandemic further exacerbates the challenges faced by Alianza's members and members of its voting constituencies, in that many of them —especially the elderly, those in frequent contact with the elderly, and those who cannot afford to become ill and incapable of supporting their family—will find it unacceptably risky to vote in person in the August Primary and November General due to concerns about being exposed to COVID-19.  As a consequence, they will have no safe option to vote other than by mail—

26

requiring them to determine, acquire and pay for sufficient (anywhere up to three stamps of) postage, which may further delay the process and require exposing themselves by visiting the post office—and put them at substantial risk of being disenfranchised due to the Vote-By-Mail Postage Requirement and Election Day Receipt Deadline. Among Alianza's members and members of its voting constituencies are voters unaccustomed to using USPS on a regular basis, such as newly eligible young voters, recent citizen migrants, and economically challenged voters, who if faced with having to determine, acquire, or pay for required postage may well be disenfranchised by delay or non-delivery of their vote-by-mail ballots.

25.    To carry out its mission and outreach efforts, Alianza relies on membership dues, donations, and grants, which are limited resources.  In light of the Challenged Provisions and how their burdens imposed by those Provisions are further exacerbated by the risks of the COVID-19 Pandemic, Alianza feels compelled to take resources away from developing content and organizing efforts directed at advancing particular progressive policies, and shift those resources to increased education and outreach efforts in the hope of mitigating at least some of the burdens of the Challenged Provisions that serve to burden and disenfranchise Alianza's members and members of its voting constituencies.  For example, because of the significant paid-staff time and financial resources that Alianza will spend on outreach efforts to mitigate the effect of the Challenged Provisions on its

voting constituencies, Alianza will have less paid-staff time and financial resources to support its advocacy campaigns on key issues affecting its members and constituencies, including advocacy for greater language access, increased affordable housing, food assistance, addressing discrimination, Covid-19 awareness, Medicaid expansion, a comprehensive redevelopment program for Puerto Rico, and its petition drive to rename Stonewall Jackson Middle School to Roberto Clemente Middle School.   As a result of the Challenged Provisions, Alianza faces the burden of having fewer resources available to advance such key progressive policies because of the effort and costs to help its members and members of its voting constituencies simply to vote and have their votes counted against the headwinds of the Challenged Provisions that serve to reduce their participation and cause their votes to go uncounted.

26.   Plaintiff FLORIDA ALLIANCE FOR RETIRED AMERICANS ("the Alliance") is incorporated in Florida as a 501(c)(4) nonprofit, social welfare organization. The Alliance has almost 200,000 members, comprising of retirees from public and private sector unions, community organizations, and individual activists. It is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work. The Challenged Provisions frustrate the Alliance's mission because they deprive individual members of the right to

vote and to have their votes counted, threaten the electoral prospects of Alliance-endorsed candidates whose supporters will face greater obstacles casting a vote and having their votes counted, and make it more difficult for the Alliance and its members to associate to effectively further their shared political purposes. Because of the burdens on mail-in voting created by the Challenged Provisions, the Alliance will be required to devote time and resources to educating its members about these requirements and assisting them in complying so that their mail-in ballots are received by Election Day, accepted, and counted. These efforts will reduce the time and resources the Alliance has to educate its members and legislators on public policy issues critical to the Alliance's members, including the pricing of prescription drugs and the expansion of Medicare and Medicaid benefits. In light of these injuries, the Alliance joins in the Equal Protection, Due Process, Poll Tax, and Voting Rights Act claims to the Challenged Provisions. The Alliance does not join in the First Amendment claim to the Voter Assistance Ban because the Alliance does not currently intend to hire organizers to help collect voters' ballots.

27.    The Alliance also brings this action on behalf of its members who face burdens on their right to vote as a consequence of the Challenged Provisions. Because all of the Alliance's members are of an age that place them at a heightened risk of complications from coronavirus, all members are overwhelmingly likely to vote by mail this year and consequently face the burdens

that the Challenged Provisions place on mail voters. The Alliance's members, for example, are voters who are likely to face difficultly acquiring postage or delivering a mail ballot themselves should they be unable to return it through the mail in sufficient time for their ballot to counted. Additionally, many of the Alliance's members are likely to be voting for mail for the first time, and thus will be more susceptible to be disenfranchised by the Election Day Receipt Deadline.

28. Plaintiff PRIORITIES USA ("Priorities") is a 501(c)(4) nonprofit, voter-centric progressive advocacy and service organization. Priorities' mission is to build a sustainable infrastructure to engage Americans in the progressive movement by running a permanent digital campaign to persuade and mobilize citizens around issues and elections that affect their lives. In furtherance of this mission, Priorities works to help educate, mobilize, and turn out voters across the country, including in Florida. In 2020, Priorities expects to make millions of dollars of contributions and expenditures to educate, mobilize, and turn out voters in state and federal elections around the country, including thousands of dollars to educate, mobilize, and turn out voters in Florida elections. Florida's Vote-By-Mail Postage Requirement, Election Day Receipt Deadline, and Voter Assistance Ban directly harm Priorities because they burden and disenfranchise the very voters Priorities supports through its work and contributions in Florida. As a result, Priorities has to expend and divert additional funds and resources in get-out-the-

vote, voter education efforts, mobilization, and turn-out activities in Florida, at the expense of its voter support initiatives in other states and other voter education and turnout programs in Florida. Specifically, the resources Priorities must divert to address the Challenged Provisions will directly affect the breadth of Priorities' advertising campaigns in Florida and other states in support of candidates and to educate voters about issues central to Priorities' mission of advancing progressive public policies. This diversion of resources also will reduce the funds available to Priorities to engage in voter turnout initiatives in Florida and other states. In addition, Priorities intends to engage in an organized effort, relying on paid workers, to assist voters with delivering ballots to election offices in the August Primary Election and the November General Election, which it cannot currently do under the Voter Assistance Ban. Specifically, if the Ban is enjoined, Priorities will engage persons working on its behalf and paid by Priorities to help voters who need assistance in delivering their ballots to election offices.

29.     Defendant RON DESANTIS is sued in his official capacity as the Governor of Florida. The Governor exerts control over the Supervisors, as he may suspend them for failure to perform their duties. *See* Fla. Const. art. IV, § 7; *see also, e.g.*, Fla. Exec. Order No. 19-19 (executive order suspending the Supervisor of Elections for Palm Beach County); Fla. Exec. Order No. 18-342 (executive order suspending the Supervisor of Elections for Broward County).

30.    Defendant LAUREL LEE is sued in her official capacity as Secretary of State of the State of Florida. The Secretary is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. Pursuant to Fla. Stat. § 97.012, the Secretary of State is the chief elections officer of the State and is therefore responsible for the administration of state laws affecting voting, including with respect to the August Primary and November General. The Secretary's duties consist, among other things, of "[o]btain[ing] and maintaining uniformity in the interpretation and implementation of the election laws." *Id.* at § 97.012(1). The Secretary is also tasked with ensuring that county Supervisors perform their statutory duties, *see id.* at § 97.012(14), is responsible for providing technical assistance to county Supervisors on voter education, election personnel training services, and voting systems, *see id.* at §§ 97.012(4)-(5), and is responsible for "[p]roviding written direction and opinions to the Supervisors of Elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State." *Id.* at § 97.012(16).

31.    Defendant ASHLEY MOODY is sued in her official capacity as the Attorney General of Florida. The Attorney General is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law. The Attorney General's authority includes overseeing the Office of the Florida Statewide Prosecutor, which has the responsibility to "investigate and prosecute . . . any crime involving voter

registration, voting, or candidate or issue petition activities." Fla. Stat. Ann. § 16.56. This responsibility includes, based on information and belief, enforcing the criminal misdemeanor provision of the Voter Assistance Ban. The Attorney General also has oversight authority over Florida's state attorneys, who may also prosecute violations of the Voter Assistance Ban. *See* Fla. Stat. Ann. § 16.08. ("The Attorney General shall exercise a general superintendence and direction over the several state attorneys of the several circuits as to the manner of discharging their respective duties . . .").

32.     Defendant FLORIDA ELECTIONS CANVASSING COMMISSION is sued as a state-created entity. Its membership consists of the Governor and two members of the Cabinet selected by the Governor, as set forth in Florida Statute § 102.111. The Commission has the authority to move back the deadline for counties to submit their election returns "if the returns are not received . . . due to an emergency." *See* Fla. Stat. § 102.112. "Emergency" is defined as "any occurrence, or threat thereof, whether accidental, natural, or caused by human beings, in war or in peace, that results or may result in substantial injury or harm to the population or substantial damage to or loss of property to the extent it will prohibit an election officer's ability to conduct a safe and orderly election." Fla. Stat. Ann. § 101.732. The coronavirus pandemic meets this definition, giving the Commission the

authority to push back the statutory deadline for counties to submit their election returns.

33.    Defendants FLORIDA ELECTION SUPERVISORS, sued in their official capacities only, are elected officials in each of Florida's 67 counties who are responsible for administering elections in their respective counties. Their responsibilities include administering voting by mail, arranging polling locations, determining when to start early voting, and, in some instances, providing drop off locations for vote-by-mail ballots. Their responsibilities also include evaluating the validity vote by mail ballots, supervising ballot counts, and certifying results. Most of Florida's 67 counties do not provide prepaid postage for mail in ballots in statewide or national elections. However, Plaintiffs have identified at least five counties that previously provided prepaid postage for statewide and national elections and likely will again:  Broward, Hillsborough, Lee, Miami-Dade, and Orange Counties. Accordingly, Supervisor PETER ANTONACCI, Supervisor of Elections for BROWARD County, Supervisor CRAIG LATIMER, Supervisor of Elections for HILLSBOROUGH County; TOMMY DOYLE, Supervisor of Elections for LEE County, CHRISTINA WHITE, Supervisor of Elections for MIAMI-DADE County, and BILL COWLES, Supervisor of Elections for Orange County are not included as Defendants in the Poll Tax or Equal Protection claims for the Vote-by-Mail Postage Requirement.

## STATEMENT OF FACTS AND LAW

### A.      Vote by Mail in Florida

34.     Since 2001, Florida has permitted any registered voter to request a vote-by-mail ballot without an excuse. Fla. Stat. Ann. § 101.62. Voters may request a vote-by-mail ballot in person, in writing, or by telephone up to ten days before an election. *Id.*

35.     As a result, mail balloting has steadily grown in Florida. In 2012, 27.8 percent of voters voted by mail; in 2016, 28.7 percent of voters voted by mail; and in 2018, 31.6 percent of all ballots cast in the 2018 general election were cast by mail—the highest share of votes cast by mail in any of the last six Florida elections. Yet, the majority of Florida voters still cast their ballots in person, either during early voting or at polling locations on Election Day. There is good reason for that.

36.     Voting by mail requires additional steps that must be taken deliberately and well in advance of Election Day to ensure that a voter's ballot is counted. First, a voter must request a mail ballot by the statutory deadline. Next, the voter must receive it in the mail and complete the required signature fields. Finally, a voter must mail it with sufficient time and postage for it to arrive to the county Supervisor's office by Election Day. These steps are not insubstantial, often requiring significant time and effort from voters to complete. Moreover, a misstep

at any point—including a misstep by the local election official, not the voter—often results in complete disenfranchisement.

37.    Florida requires most voters who choose to return their ballots by mail must also provide their own postage, *see* Fla. Stat. Ann. § 101.65 (instructing voters to "be sure there is sufficient postage if mailed"), and prominently displays "Postage Required" on the front of each return envelope that is mailed out. This requirement imposes both monetary and transaction costs that bear most heavily on individuals who are least likely to be able to overcome them, including students, the elderly, and low-income citizens.

38.    In this digital era, many voters do not regularly keep postage stamps in their homes, and therefore must visit a post office or other essential business to obtain the correct postage. Purchasing a book of 20 stamps online, for example, will cost voters $11—an unnecessary expense that could be cost-prohibitive for students and individuals with lower incomes, posing a significant hurdle to returning the ballot and voting.

39.    The amount of postage required for a mail ballot is also not readily apparent to voters. Vote-by-mail ballots are generally a non-standard size, include two envelopes, and have varying weight depending upon the number of elections on the ballot. Fla. Stat. Ann. § 101.64. As a result, even where a person has stamps,

mailing their ballot may still necessitate a trip to the post office to weigh the envelope and determine the proper amount of postage to affix.

40.     For elderly voters, voters who have disabilities, who live far from a post office, have limited access to transportation, are immunocompromised or have other high-risk factors for COVID-19, this trip deters them from voting as it may be nearly impossible for some voters to make and for others it poses grave health and safety risks. The extra time spent acquiring postage or inquiring about the amount of postage needed also increases the transaction cost of voting, slowing down the voting process and making the voter more likely to mail the ballot later in election cycle. In turn, this places these voters at heightened risk of their mail ballot arriving after the Election Day Receipt Deadline.

41.     Indeed, even where a voter is able to overcome the hurdles placed on them by Florida's Vote-By-Mail Postage Requirement, their risk of disenfranchisement remains high. Each year, Florida rejects a significant number of ballots that arrive after the Election Day Receipt Deadline. *See* Fla. Stats. Ann. §§ 101.67(2), 101.6103(2), and 101.64.

42.     In 2018, for example, Florida disenfranchised over 17,000 voters, refusing to even count their ballots—the vast majority of which were completed and mailed before Election Day—simply because they arrived after the Election Day Receipt Deadline.

43.     There is no question that these ballots' late arrivals were due to no fault of the voter. Despite requesting vote-by-mail ballots well before the deadline, due either to delayed mail times or the inability of local Supervisors to respond to requests by the statutory deadline (eight days before Election Day, *see* Fla. Stat. Ann. § 101.62), over 20,700 vote-by-mail ballots were delivered to voters just days before Election Day in 2018. As a result, many voters—a disproportionate number of whom were young, college students—did not receive their vote-by-mail ballots until just days before the 2018 general election, leaving them with insufficient time to return their ballots so that they would arrive by the Election Day Receipt Deadline. *See* Sarah Blaskey, *South Florida's absentee-ballot blues: 'I am infuriated that I was not able to vote'*, Miami Herald, (Nov. 13, 2018), https://www.miamiherald.com/news/politicsgovernment/election/article221518235 .html.

44.     And year after year, voters are disenfranchised by the Election Day Receipt Deadline in part because Defendants fail to adequately communicate when ballots must be mailed to ensure they will be counted.

45.     According to USPS and multiple local election Supervisors, ballots must be mailed at least a week before Election Day to ensure timely arrival. *See, e.g.*, United States Postal Service, *State and Local Election Mail: User's Guide* (Jan. 2020), https://about.usps.com/publications/pub632.pdf ("[T]he Postal Service

recommends that voters mail their marked return ballots at least 1 week before the due date"); Pinellas County Supervisor of Elections Office, Frequently Asked Questions- Voting by Mail, https://www.votepinellas.com/Mail-Ballots/FAQs-Voting-By-Mail ("PLEASE NOTE: Postal delivery service has changed. Voters are advised to allow at least ONE WEEK for their ballot to be returned by mail to the Supervisor of Elections office."). Ballots arriving less than a week before Election Day, like those in 2018, simply will not arrive in time to be counted unless the voter undertakes extraordinary efforts, and even then, such efforts may not be enough.

46.    Indeed, in 2018, at least one young voter reported attempting to send the mail ballot she received the day before Election Day at her temporary home in Philadelphia via FedEx or UPS, but even those commercial services were not able to deliver the ballot in time for it to be counted. Sarah Blaskey, *South Florida's absentee-ballot blues: 'I am infuriated that I was not able to vote'*, Miami Herald, (Nov. 13, 2018), https://www.miamiherald.com/news/politicsgovernmentpolitics-government/election /article221518235.html. When the voter called the Miami-Dade Supervisor to inquire about her options, she was told effectively that there were none.

47.    In addition to untimely receipt of ballots, cost cutting measures and a shrinking USPS workforce have led to delivery delays in south Florida since at

least 2014. And in 2018, the south Florida town of Opa-locka made headlines when 266 ballots were discovered in the back of a USPS mail-sorting facility and were not delivered to the local Supervisors' office until four days after the Election Day Receipt Deadline. None of these ballots were counted, and it was through no fault of the voters.

48.    The number of ballots rejected due to the Election Day Receipt Deadline is not inconsequential either. In 2018, former Governor Rick Scott defeated incumbent Senator Bill Nelson by just 10,000 votes in the race for U.S. Senate, well within the range of ballots discarded due to the Election Day Receipt Deadline.

49.    Despite the substantial number of late ballots, the State places significant limits on critical voter assistance that could help ensure that voters' ballots arrive on time.

50.    Florida's Voter Assistance Ban prohibits paid collectors from assisting more than two nonfamily member voters with returning their ballots. If they do, these collectors risk a misdemeanor charge punishable by a term of imprisonment up to a year. Fla. Stat. Ann. §§ 104.0616, 775.082.

51.    As a result, organizations like Priorities USA and Alianza are unconstitutionally prohibited from exercising their First Amendment rights to assist voters. This leaves particularly vulnerable populations, such as disabled

voters, elderly voters, and voters with limited access to the mail and transportation with limited options for help turning in their ballots. It similarly reduces the support available to voters who receive their mail ballots with insufficient time to return them.

52.     While these inadequacies in Florida's vote-by-mail system are constitutionally problematic in their own right, they will only be exacerbated by the current coronavirus crisis, burdening and disenfranchising significantly more voters in the upcoming August Primary and November General elections.

**B.     The Exacerbating Effect of the Coronavirus Crisis on Florida's Vote-By-Mail System**

53.     COVID-19, the severe and sometimes deadly disease caused by the novel coronavirus, has been spreading through Florida for several months. To date, there are 35,463 confirmed cases in the state, and 1,364 Floridians have died from the disease. Current models predict that approximately 2,000 people in Florida will die from COVID-19 by August. To slow the curve and to protect their health as well as the health of their friends, family, and community, Floridians across the state are engaging in social distancing and remain under a statewide stay-at-home order. These actions have helped protect Floridians health, but they have also had a severe economic impact on the state, with almost 2 million Floridians filing for unemployment benefits since the crisis began.

54.     While the Governor has formed a task force to re-open the state, there is no clear end in sight to the spread of COVID-19 or the economic devastation it is causing and, by all accounts, the crisis is expected to last many months and likely well into the 2020 general election cycle.

55.     The federal government has announced that it is preparing for the COVID-19 crisis to last 18 months and has warned that the pandemic could come in "multiple waves." The White House's coronavirus advisor and the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, was asked at a White House press conference whether the United States was "prepared for [coronavirus] to strike again, say, in the fall?" Dr. Fauci responded that, "[i]n fact I would anticipate that that would actually happen because of the degree of transmissibility." Joseph Guzman, *Fauci predicts another coronavirus outbreak in fall with 'very different' outcome*, THE HILL (Mar. 31, 2020), https://thehill.com/changing-america/well-being/prevention-cures/490326-fauci-predicts-another-coronavirus-outbreak-in.

56.     Similarly, the Director of the National Center for Immunization and Respiratory Diseases at the CDC, Dr. Nancy Messionnier, said in March 2020 that she expected the virus to continue spreading in the United States until next year. These sentiments are also shared by scientists outside the United States government. The COVID-19 Response Team at the Imperial College of London

has estimated that social distancing and other preventative measures will be required until a vaccine is developed and distributed widely, which they predict could take "18 months or more."

57.   Even if the community spread of COVID-19 in Florida has significantly decreased by this upcoming election season, CDC guidelines recommend that individuals take meaningful social distancing measures even if there is a "minimal" threat of community transmission of COVID-19 in the area. This guidance is necessitated by the reality that asymptomatic carriers appear to be contributing significantly to community spread, and until there is a vaccine or widespread "herd immunity" (i.e., at least 60% of the population has been infected and recovered), Americans will remain at serious risk of contracting this unpredictable and deadly virus.

58.   Florida's Supervisors, recognizing that this crisis will last months and affect the August Primary and November General, have alerted the Governor to the challenges they faced in the March 17 PPP, and asked for changes meant to ease the burdens that local election officials will encounter due to a likely record increase in voting by mail.

59.   The Supervisors are right to seek changes. The CDC, anticipating difficulties in conducting elections during the COVID-19 crisis, has now recommended that jurisdictions encourage voting by mail and reduce methods of

voting that lead to direct contact with other voters or poll workers. Other federal, state, and local officials have increasingly come to the same realization. Congress, for example, has authorized $400 million to help states transition to voting-by-mail.

60.     To date, at least fifteen states and Puerto Rico have been forced to postpone their primary elections to avoid public health risks posed by the virus. States that have not postponed their elections and attempted to conduct in-person voting have seen utter chaos result. In Wisconsin, for example, Milwaukee was forced to reduce its polling locations from 180 to just five locations because of a severe shortage of poll workers, forcing voters to decide whether to risk their health to cast their ballot and, ultimately, leading to thousands of Wisconsin citizens being forced to stand in long lines for hours to cast their ballots, many wearing masks, gloves, and other protective gear as they congregated together to vote several hour-long lines at the polls. At least 50 individuals who participated in the election have been diagnosed with COVID-19—a number that is anticipated to grow.

61.     The inherent challenges to voting in-person during this pandemic led voters in Wisconsin to request absentee ballots at unprecedented rates, with more than a million voters requesting absentee ballots for the recent primary, four times the number who did so in the 2016 general election. This increased interest in

voting by mail, combined with decreases in available elections staff and other social distancing efforts, placed a significant strain on local election boards, several of which were not able to send voters a ballot in time for it to be returned—or even delivered to them—by the normal Wisconsin Election Day Receipt Deadline. *See Democratic National Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 1638374, at \*38-39 (W.D. Wis. Apr. 2, 2020). This crisis ultimately necessitated federal litigation that reached the U.S. Supreme Court and resulted in the implementation of a postmark rule, whereby ballots postmarked by Election Day could be counted as long as they are received within six days of Election Day. *See Republican Nat'l Comm.*, 2020 WL 1672702, at \*2. Over 100,000 ballots in Wisconsin were postmarked by, but arrived after, Election Day. Each of those Wisconsin voters would have been disenfranchised without court intervention.

62.    Like Wisconsin, Florida did not postpone its March 17, 2020 PPP, and counties' election operations were acutely affected by the crisis, even though the crisis was just beginning. Supervisors across the state reported significant poll worker cancellations, including many at the last minute. Polling locations were changed as many counties moved polling locations out of senior facilities. And on Election Day, counties reported a significant lack of hand sanitizer. Shortly after the PPP, at least two poll workers in Broward County tested positive for COVID-19.

63.    Across the state, the Supervisors anticipate that many of these challenges will persist in the August Primary and November General, and that due to a lack of desire to be in the same place as other individuals as well as continued social distancing, there will be a significant increase in voting by mail.

64.    The Duval County Supervisor has reported that he will likely need to replace more than half his poll workers, 60 percent of whom are older than 65, in the upcoming elections. The Miami-Dade Supervisor is concerned that she will be unable to secure the 600 polling locations necessary to conduct in-person voting, while also preparing for an increase in mail voting. In Hillsborough County, the Supervisor of Elections anticipates that mail balloting will double.

65.    Given that in 2018, with just 31 percent of voters voting by mail, Supervisors across the state were unable to process mail ballot applications before the statutory cutoff, leaving voters with insufficient time to mail them back before the Election Day Receipt Deadline, it is all but certain (and understandable) that they will be unable to process the influx of applications that they will receive for the August Primary and November General in a timely fashion. This is precisely what happened in Wisconsin in its April 7 primary election, resulting in over 100,000 ballots arriving after Election Day.

66.    An increase in voting by mail also means that a significant number of voters who typically vote in person will be voting by mail, and many of those

voters will be voting by mail the first time. These voters differ from current mail voters in important respects that make them even more likely to be burdened by having to pay for postage and by being required to have their ballots arrive by Election Day instead of postmarked on or before Election Day. These first-time mail voters, in particular, will require assistance in completing the mail voting process.

67.     Compared to traditional mail voters, in-person voters tend to be of a lower socio-economic status, meaning that as they transition to mail voting, they are far more likely to face challenges in paying for or obtaining postage and, as new mail voters, they are less likely to know how much postage is needed. Moreover, given the devastating economic impacts of the coronavirus, many voters' sources of income have been eradicated due to the mounting crisis, further increasing the number of individuals who likely will find the costs of stamps or the costs of traveling to obtain stamps prohibitive in this increasingly desperate economic situation.

68.     Given that many voters who switch to mail voting will be doing so precisely because they are immunocompromised, have conditions placing them at high risk for COVID-19, or are generally concerned about their health or the health of their family and friends, they will be far less likely to venture out to purchase

stamps if they do not already have them in their home or to leave home to go to the post office to determine the proper amount.

69.    Those voters transitioning to mail voting from Election Day voting also tend to be "late deciders;" that is, they decide who they will vote for later in the process, typically at the end of the campaign. Because of that, they are more likely to cast a mail ballot at the end of the voting process with only a few days to go until Election Day.

70.    It is unremarkable that these voters would be more likely to cast their vote-by-mail ballots later given that they are also likely to be less familiar with the voting by mail, including the Election Day Receipt Deadline. Nor would it be unreasonable for them to think that their ballots can be mailed later in the election cycle as long as they are postmarked by Election Day, as many other deadlines in Florida voters' lives—including voter registration deadlines—are postmark deadlines. *See, e.g.*, Fla. Stat. Ann. § 97.053 (accepting voter registrations postmarked by the deadline); *id.* § 101.6952 (accepting postmark deadlines for overseas ballots); *id.* § 192.047 (applying a postmark deadline to tax returns or applications); *id.* § 607.15092 (applying a postmark deadline to annual fees for corporate registrations); *id.* § 197.582 (applying a postmark deadline for property claim filings).

71.     For the same reasons, these voters are much more likely to need assistance with casting their ballots so that they can avoid the pitfalls that too often lead to rejection. And absent the option for paid and trained organizers to help collect their ballots, such assistance is likely to be hard to find as people continue to social distance.

72.     Finally, at the same time that mail balloting increases, USPS is facing a budget crisis that will likely lead to delays in mail delivery, raising particular concerns for Florida, which already experiences slow and unreliable mail service and, as a result, has had to ask voters to mail their ballots up to a week days before Election Day even before COVID-19—and, even when that advice is followed, has still had ballots arrive well after Election Day. Together, these circumstances guarantee that as the COVID-19 crisis continues, Florida voters will find it increasingly difficult to ensure that their ballots arrive before the Election Day Receipt Deadline without assistance.

### C.     The State Has No Adequate Interest in the Challenged Laws and Policy Generally, and Even Less Interest During the Pandemic

73.     Even before the coronavirus crisis, the State's interests in the Challenged Provisions were thin. In the context of COVID-19, they are virtually nonexistent.

74.     The State has no legitimate interest in imposing the Vote-By-Mail Postage Requirement. Providing postage to allow citizens to complete voting as

well as other important government-related functions is a common practice that has been adopted by federal, state, and county governments. For instance, at least sixteen states prepay postage on vote-by-mail ballots. *See* Ariz. Rev. Stat. § 16-542; Cal. Elec. Code § 3010; 15 Del. Code § 5504; Haw. Rev. Stat. § 11-102; Ind. Code § 3-11-4-20; Iowa Code Ann. § 53.8; Minn. Stat. Ann. § 203B.07; Mo. Rev. Stat. § 115.285; Mont. Code § 13-13-214; Nev. Rev. Stat. § 293.323; N. M. Stat. Ann. § 1-6-8; Ore. Rev. Stat. § 254.473; R.I. Gen. Laws § 17-20-10; Wash. Rev. Code § 29A.40.091; W. Va. Code Ann. § 3-3-5; Wis. Stat. Ann. § 6.87. Likewise, the United States Census Bureau sends census surveys with postage-prepaid return envelopes. Florida provides, as the National Voter Registration Act requires, a postage-prepaid return envelope when it asks voters to verify their address for the purpose of voter registration. And, in its coronavirus stimulus package, Congress allocated $400 million for elections, which can be used to cover the cost of prepaying postage, among other expenses.

75.     Moreover, studies have shown that sending absentee ballots in postage-prepaid envelopes increases mail voting turnout. When King County, Washington launched prepaid postage pilot programs during the 2017 and 2018 primary elections, the county found that voters returned their absentee ballots via USPS at higher rates when they received return envelopes with postage prepaid. In the 2016 general election, before pre-paid postage was implemented, 48% of the

tested group of voters returned their absentee ballots via USPS. In 2017, after pre-paid postage was implemented, 81% of those same voters did. Voters were not only more likely to return their ballots by mail, they were also more likely to *vote*. In the 2017 primary, turnout rose 10%. In the 2018 primary, it rose 6%. Following these pilot programs, King County sent all absentee ballots with postage-prepaid return envelopes. Shortly after that, the Governor and Secretary of State of Washington funded prepaid postage for every county in the state. This experience shows, not surprisingly, the enfranchising effects of prepaid postage and, conversely, the impediments to voting that result from voters having to pay for postage.

76.    The justifications for Election Day Receipt Deadline also fail to hold water, and this is particularly true where the State has a history of mailing ballots to voters after the statutory deadlines and known mail distribution challenges. While Florida may set a reasonable deadline for receiving ballots to ensure the finality of election results, the Election Day Receipt Deadline is not reasonable: voters do not reasonably expect that they must submit their ballots so far in advance of Election Day—particularly where they are not even receiving them until mere days before. And where the vast majority of deadlines that voters encounter in their daily lives, including the voter registration deadline and the deadline for UOCAVA ballots, are postmark deadlines, it is all the more

reasonable for voters, and especially new voters, to expect that their ballots will be counted if they are postmarked by Election Day.

77.     The Election Day Receipt Deadline is also unnecessary to ensure that all ballots are received and counted within a reasonable time. In fact, as noted, ballots from overseas voters are not required to be received until *ten days after Election Day*, provided they are postmarked by Election Day.[2] Fla. Stat. Ann. § 101.6952. Thus, vote tallies are not final on Election Day, and there is no reason that regular vote-by-mail ballots could not be placed on the same timeline as UOCAVA ballots. This is particularly true during the pandemic where mailing delays are imminent and in-state voters now find themselves similarly positioned to UOCAVA voters in that regard.

78.     Finally, the State's justifications for the Voter Assistance Ban are also weak. Indeed, voter fraud is extremely rare in Florida. Moreover, Florida has other protections in place that would better protect directly against such actions such as prohibiting: fraud in connection with casting a vote, Fla. Stat. Ann. § 104.041, the designation of a choice on a ballot for another person, *id.* § 104.047, voting a

---

[2] The term "postmark" refers to any type of imprint applied by the postal service to indicate the location and date the postal service accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks. Where a ballot does not bear a postmark date, it should be presumed to have been mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after Election Day.

fraudulent ballot, *id.* § 104.16, as well as "vote-buying" and "vote-selling," *id.* §§ 104.061(2), 104.045. This kind of voter assistance is particularly needed in the current crisis where existing methods of turning in ballots through volunteers are increasingly less likely to occur as people attempt to socially distance and paid, trained, and organized campaign staff may be the only functional way to assist people with turning in their ballots in the August Primary and November General elections.

79.     Absent relief from this Court the individual and cumulative impacts of the Vote-By-Mail Postage Requirement, Election Day Receipt Deadline, and Voter Assistance Ban will impose a severe burden on Florida voters, deterring them from participating in the August Primary and November General and disenfranchising them. If these laws stand, many Florida voters will find themselves faced with the same unconscionable choice that Wisconsin voters faced on April 7—their health and safety versus their right to vote. This Court has the ability to ensure that both are protected, and it should do so.

## **CLAIMS FOR RELIEF**

## **COUNT I**

**Equal Protection**
**U.S. Const. Amend. I & XIV, 42 U.S.C. § 1983**
*Undue Burden on the Right to Vote*
*(Election Day Receipt Deadline, Voter Assistance Ban, & Vote-by-Mail Postage*
*Requirement)*

80.     Plaintiffs reallege and reincorporate by reference paragraphs 1-79 of this Complaint as though fully set forth therein.

81.     Under the *Anderson-Burdick* balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

82.     This balancing test utilizes a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting rights. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019).

83.     Courts need not accept a state's justifications at face value, particularly where those justifications are "speculative," otherwise it "would convert *Anderson-Burdick*'s means-end fit framework into ordinary rational-basis review wherever

the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018) (citing *Pub. Integrity All.,* 836 F.3d at 1024–25); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) ("However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests *sufficiently weighty to justify the limitation*.") (internal citation and quotation marks omitted) (emphasis added); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19 ("And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law.").

84.    Florida's Vote-By-Mail Postage Requirement, Election Day Receipt Deadline, and Voter Assistance Ban impose a severe burden on all Florida voters who vote by mail.

85.    Florida's Vote-By-Mail Postage Requirement imposes monetary costs on the only safe alternative to voting for individuals who would otherwise have to subject themselves to the health risks of waiting to vote at the few consolidated and potentially crowded polling locations available. These costs bear most heavily on low-income voters and those who are affected by the devastating economic impact of the ongoing public health emergency. Even for voters able to withstand the economic costs, the postage requirement imposes practical burdens—i.e., traveling

to a post office to purchase stamps—that will deter voters with disabilities, limited access to transportation, and voters concerned about the attendant health risks. There is little justification for failing to provide such postage given the benefits for voter turnout as well as the ready source of funding provided by the federal government. Thus, Florida's failure to provide an opportunity for eligible citizens to vote by mail, without cost, violates the First and Fourteenth Amendments.

86.   The Election Day Receipt Deadline also poses a severe burden on voters' right to vote. Voters must first learn about the Election Day Receipt Deadline and accurately guess when their ballot must be mailed for it to be counted, if they have even received their ballot in time to mail it. For those voters who, through no fault of their own, misjudge how long it will take for their ballot to arrive back in the county, or for those whose ballots are simply left unopened in a mail processing center, or do not reach the voter until a day or two before Election Day, the punishment is swift and severe: total disenfranchisement. But Florida's Election Day Receipt Deadline also severely burdens all voters who vote by mail even if those voters' ballots are successfully counted. By requiring voters to cast their vote-by- vote-by-mail ballots a week before the election for those ballots to be counted, Florida's Election Day Receipt Deadline forces Florida voters to cast their ballots before they can account for any critical information about the election or the candidates that arise in the final week leading up to

Election Day. Florida's Election Day Receipt Deadline thus deprives voters of the ability in to engage in this robust period of civic engagement, because it effectively requires them to have already cast their vote. Moreover, the magnitude of individuals burdened by the Election Day Receipt Deadline is certain to rise in the August Primary and November General in light of the current public-health emergency due to increased mail delays and processing times needed for Supervisors to vote-by-mail ballots out.

87.     Similarly, the Voter Assistance Ban imposes a severe burden on the right to vote because it will effectively disenfranchise voters who require assistance turning in their vote-by-mail ballots, but lack access to a family member or friend who is able to provide such assistance. The State's interest in enforcing the Voter Assistance Ban cannot justify disenfranchising voters who require assistance but lack individuals to provide it. Other Florida laws already criminalize any exercise of undue influence or voting fraud that might be captured by the Voter Assistance Ban.

88.     In short, Florida's Election Day Receipt Deadline, Voter Assistance Ban, and Vote-by-Mail Postage Requirement are not supported by a state interest that is sufficient to justify the resulting burden on the right to vote, and thus unduly burden the right to vote of all Florida voters in violation of the First and Fourteenth Amendments.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A.   Declaring that Florida's Election Day Receipt Deadline, Voter Assistance Ban, and Vote-By-Mail Postage Requirement violate the First and Fourteenth Amendments to the U.S. Constitution;

B.   Preliminarily and permanently enjoin, Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots that are postmarked by Election Day and arrive at their respective Supervisor's office within ten days;

C.   Preliminary and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Voter Assistance Ban, allowing voters to designate any third party—whether paid or not—to assist in the collection and submission of their vote-by-mail ballots;

D.   Preliminary and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from requiring that voters provide postage on their vote-by-mail ballots and further require that Florida provide prepaid postage on all vote-by-mail ballots;

E.   Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

F.   Granting such other and further relief as the Court deems just and proper.

## COUNT II

### Due Process
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983
### Denial of Procedural Due Process
### (Election Day Receipt Deadline)

89.     Plaintiffs reallege and reincorporate by reference paragraphs 1-79 of this Complaint as though fully set forth herein.

90.     The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 1. Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015). Courts must first consider "the nature of the interest that will be affected" by the government's action as well as the "degree of potential deprivation that may be created" by existing procedures. *Id.* at 1192–93. Second, "courts must consider the 'fairness and reliability' of the existing procedures and the 'probable value, if any, of additional procedural safeguards.'" *Id.* at 1193 (quoting *Mathew*s, 424 U.S. at 343). Finally, courts must consider "the public interest, which 'includes the administrative burden and other societal costs that would be associated with' additional or substitute procedures. *Id.* (quoting *Mathews*, 424 U.S. at 347). Overall, "due process is flexible and calls for

59

such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334, (quotation and citation omitted).

91.    Florida's vote-by-mail procedures must comport with due process. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id.*; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

92.    "When an election process reache[s] the point of patent and fundamental unfairness,' there is a due process violation." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995)). A state's elections system, "the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter's [ability to vote] and that fails to give voters a fair opportunity to [participate], is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment." *Id.* at 1185.

93.     The nature of the interest at stake in this case—the right to vote and to have that vote count—is the most precious liberty interest of all because it is preservative of all other basic civil and political rights.

94.     But Florida's existing procedures for counting vote-by-mail ballots too often deprive voters of having their ballot counted because (1) many voters do not learn of the Election Day Receipt Deadline before Election Day, and (2) even voters who do learn of the Election Day Receipt Deadline may not have their ballots counted if those ballots do not arrive in the mail at the county Supervisor's office, through no fault of their own, by 7 p.m. on Election Day. Florida's Election Day Receipt Deadline further deprives all Florida voters who vote by mail of the ability to cast a meaningful and informed vote by requiring voters to cast their ballots a full week before Election Day if they wish to ensure that their ballots will actually be counted.

95.     Florida's Election Day Receipt Deadline is neither a reliable nor fair way to administer voting by mail. The Election Day Receipt Deadline and the corresponding cutoff for casting ballots is, in fact, devoid of reliability because many voters are not even sent their vote-by-mail ballots until after the mailing cutoff, leaving them with no options for placing their ballots in the mail to be counted. Nor is the Election Day Receipt Deadline fair because it forces those

voters to cast their ballots with incomplete information and before candidates have delivered their final pitches to the voters.

96.    The value of additional or substitute procedural safeguards to ensure that the votes of Florida's mail voters are both meaningfully cast and actually counted is readily apparent. A substitute procedure—requiring vote-by-mail ballots to be postmarked on or before Election Day and received by the county within, at a minimum, ten days after Election Day to be counted—solves the inequities inherent in Florida's Election Day Receipt Deadline. A postmark date not only offers a reliable date to Florida voters by which they must cast their ballots, but it also ensures that voters who receive their ballots late through no fault of their own, are still able to engage in the franchise. A postmark date additionally ensures that all of Florida's voters can consider any information that may arise and influence voters' choices in the last week of the election.

97.    Because Florida counties are not required to finalize its election results for twelve days after the election, *see* Fla. Stat. Ann. § 102.112, and already allows UOCAVA voters to mail their ballots in for up to ten days after Election Day, *see* Fla. Stat. Ann. §§ 101.6952(5), requiring Florida to accept ballots that are postmarked on or before Election Day and which arrive within ten days of Election Day would put no administrative burden on the state. And, as the Supreme Court

has explained, "administrative convenience" cannot justify the deprivation of a constitutional right. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).

98.    Having induced its voters to vote by mail, Florida must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. Because Florida's Election Day Receipt Deadline is markedly inadequate in all those respects, and Florida is readily capable of instituting a substitute procedure which would protect those voters' rights with minimal burden to the state, Florida's Election Day Receipt Deadline violates Florida voters' procedural due process rights.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment:

A.    Declaring that the Election Day Receipt Deadline violates the Due Process Clause;

B.    Preliminarily and permanently enjoin, Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots that are postmarked by Election Day and arrive at their respective Supervisor's office within ten days;

C.    Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws;

D.    Granting such other and further relief as the Court deems just and proper.

## COUNT III

**Poll Tax**
**U.S. Const. Amend. XIV and XXIV, 42 U.S.C. § 1983**
**Imposition of a Poll Tax**
**(Vote-by-Mail-Postage Requirement)**

99.     Plaintiffs reallege and reincorporate by reference paragraphs 1-79 of this Complaint as though fully set forth herein.

100.    The Twenty-Fourth Amendment to the United States Constitution provides that: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend XXIV, § 1.

101.    But Florida requires individuals who cast a mail ballot to pay for postage to return their ballots by mail. Requiring voters to spend money to submit a mail ballot imposes an unconstitutional poll tax in violation of the Twenty-Fourth Amendment. Indeed, Florida voters—and particularly voters who are low-income, disabled, or homebound due to COVID-19—are being forced to pay "a price for the privilege of exercising the franchise." *Harman v. Forssenius*, 380 U.S. 528, 539 (1965).

102.    Based on the foregoing, the Secretary has deprived and will continue to deprive Plaintiffs and their members and constituents of their right to vote in

federal elections, secured to them by the Twenty-Fourth Amendment to the United

States Constitution and protected by 42 U.S.C. § 1983.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter

judgment:

A.   Declaring that the Vote-By-Mail Postage Requirement violates the Fourteenth and Twenty-Fourth Amendments as an unconstitutional poll tax;

B.   Preliminary and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from requiring that voters provide postage on their vote-by-mail ballots and further require that Florida provide prepaid postage on all vote-by-mail ballots;

C.   Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

D.   Granting such other and further relief as the Court deems just and proper.

## COUNT IV

**Free Speech and Association**
**U.S. Const. Amend. I, 42 U.S.C. § 1983**
**Violation of Free Speech and Associational Rights**
**(Voter Assistance Ban)**

103.   Plaintiffs Priorities USA and Alianza reallege and reincorporate by

reference paragraphs 1-79 of this Complaint as though fully set forth herein.

104. The First Amendment protects against the promulgation of laws "prohibiting the free exercise [of] or abridg[ment] of freedom of speech." U.S. Const. amend. I.

105. The Supreme Court has applied "exacting scrutiny" to review laws governing election-related speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)). Restrictions on such speech are unconstitutional when they "significantly inhibit" election-related speech and association and are "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 192 (1999).

106. Voter turnout efforts, including assisting voters with the submission of vote-by-mail ballots, are a means by which Plaintiffs Priorities USA and Alianza communicate their belief in the power and importance of participating in democratic elections. Such activity is "the type of interactive communication concerning political change that is appropriately described as 'core political

speech.'" *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988); *see League of Women Voters*, 400 F. Supp. 3d at 720 ("Encouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity.") (internal quotation marks and alterations omitted). And it does not matter if the individuals performing those acts are paid, trained organizers or volunteers. The act of assisting voters to submit ballots by any individuals is inherently expressive and an individual or organization that conducts such activities engages in speech by encouraging voting. *See Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir. 1997) (rejecting the argument that regulating an election "process" raises no First Amendment concerns).

107.   Furthermore, under the United States Constitution, First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969). "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214-15 (1986)).

108.   The conversations and interactions between Plaintiffs Priorities and Alianza and their respective organizers and voters surrounding the submission of ballots are forms of protected political speech and association. *See Williams v.*

*Rhodes,* 393 U.S. 23, 30 (1968) (describing the "overlapping" rights "of individuals to associate for the advancement of political beliefs" and "of qualified voters . . . to cast their votes effectively"); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700-01 (N.D. Ohio 2006) (explaining that "participation in voter registration implicates a number of both expressive and associational rights which . . . belong to—and may be invoked by—not just the voters seeking to register, but by third parties who encourage participation in the political process"). Florida's Voter Assistance Ban violates that speech by "limit[ing] the number of voices who will convey [Priorities USA and Alianza's] message," and "the size of the audience they can reach." *Meyer*, 486 U.S. at 422-23. Indeed, given the current public-health crisis, the form of speech that Priorities USA and Alianza seek to engage in is "the most effective, fundamental, and [likely] economical avenue of political discourse," yet it is directly foreclosed by the Voter Assistance Ban. *Id.* at 424.

109.  Moreover, the threat of criminal penalties for violating the Voter Assistance Ban deters individuals from participating in Plaintiff Priorities USA and Alianza's get-out-the-vote efforts and thus has a chilling effect on Plaintiffs' get-out-the-vote efforts—the means by which Plaintiffs associate with each other and voters, and communicate with voters about the importance of voting. *See League of Women Voters*, 400 F. Supp. 3d at 720 (noting that even the threat of civil

penalties "is likely to have a chilling effect on the entirety of [a voter registration] drive, including its communicative aspects.").

110.   These burdens are severe, and the Voter Assistance Ban are not narrowly tailored to advance a compelling state interest. The Voter Assistance Ban thus represent an overbroad restriction on political speech and political organizing that infringes the constitutional rights of Priorities USA, Alianza, and other Floridians.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A.   Declaring that the Voter Assistance Ban violates the First Amendment as an unreasonable restriction on speech and association;

B.   Preliminary and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Voter Assistance Ban, thus allowing voters to designate any third party—whether paid or not—to assist in the collection and submission of their vote-by-mail ballots;

C.   Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

D.   Granting such other and further relief as the Court deems just and proper.

## COUNT V

**Violation of Section 208 of the Voting Rights Act of 1965,
52 U.S.C. § 10508
Preemption
(Voter Assistance Ban)**

111.   Plaintiffs Priorities USA and Alianza reallege and reincorporate by reference paragraphs 1-79 of this Complaint as though fully set forth herein.

112.   The Voter Assistance Ban conflicts with and violates Section 208 of the Voting Rights Act, 52 U.S.C. § 10508, and is thus preempted and invalid. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) ("[S]tate laws that conflict with federal law are without effect.") (citations omitted); *Gade v Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (conflict preemption occurs when (a) where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, or (b) "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (quotation marks omitted).

113.   Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." Within the context of the Voting Rights Act, the act of voting includes "all action necessary to make a vote effective in any primary, special, or general election." 52 U.S.C. § 10310(c)(1). This includes casting an absentee ballot. *OCA-Greater Hous. v.*

*Texas*, 867 F.3d 604, 615 (5th Cir. 2017) ("'To vote,' therefore, plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process before entering the ballot box, 'registration,' and it includes steps in the voting process after leaving the ballot box, 'having such ballot counted properly.' Indeed, the definition lists 'casting a ballot' as only one example in a non-exhaustive list of actions that qualify as voting."). Section 208's only limitation on this right is that the person providing assistance may not be connected to the voter's employer or union.

114.   Congress passed the Voting Rights Act to correct entrenched "racial discrimination in voting" that was "an insidious and pervasive evil." *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966). In recommending that Section 208 be added to the Voting Rights Act, the Senate Judiciary Committee recognized that voters with disabilities "run the risk that they will be discriminated against at the polls and that their right to vote in State and Federal elections will not be protected." S. Rep. No. 97-417, at 62 (1982). To limit that risk, those voters "must be permitted to have the assistance of a person of their own choice." *Id.*

115.   Section 208 preempts the Voter Assistance Ban because state law criminalizes conduct expressly allowed by Section 208. The Voter Assistance Ban unlawfully limits the rights afforded to voters by Section 208 by prohibiting voters who need help returning their vote by mail ballots from receiving assistance from

the person of their choice. Under Florida law, a voter is not free to choose anyone they like to help return an absentee ballot. *See* Fla. Stat. Ann. § 104.0616. Section 208 cannot be interpreted to permit the Voter Assistance Ban to stand. *See OCA-Greater Hous.*, 867 F.3d 604 (Section 208 preempted a Texas law restricting who may provide interpretation assistance to English-limited voters); *United States v. Berks Cty., Pa.*, 277 F. Supp. 2d 570, 580 (E.D. Pa. 2003) (county election law restricting who may provide language assistance to Spanish-speaking voters violated Section 208).

116.    In fact, in its report recommending that this protection be added to the Voting Rights Act, the Senate Judiciary Committee noted that state restrictions that "deny the assistance at some stages of the voting process during which assistance was needed" would violate Section 208. S. Rep. No. 97-417, at 63 (1982). By prohibiting a voter who needs assistance completing their absentee ballot application from being helped by anyone who *offers* to help them, the Voter Assistance Ban also violates Section 208.

117.    The Voter Assistance Ban affects Florida citizens with disabilities disproportionately. According to the CDC, approximately 28.1% of adults in Florida suffer from some disability. CDC, Disability & Health U.S. State Profile Data    for    Florida    (Adults    18+    years    of    age), https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/florida.html.   In   2012,

"close to one-tenth of people with disabilities who voted by mail reported having difficulties in doing so, saying they needed assistance filling out or sending the ballot." Lisa Schur et al., *Accessible Democracy: Reducing Voting Obstacles for People with Disabilities*, 14 Election Law J. 60, 63 (2015).

118. Defendants' enforcement of the Voter Assistance Ban prevents Florida voters with disabilities from receiving the voting assistance that Section 208 of the Voting Rights Act guarantees them.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A.   Declaring that the Voter Assistance Ban is preempted by Section 208 of the Voting Rights Act;

B.   Preliminary and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Voter Assistance Ban, thus allowing voters to designate any third party—whether paid or not—to assist in the collection and submission of their vote-by-mail ballots;

C.   Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

D.   Granting such other and further relief as the Court deems just and proper.

Dated: May 4, 2020                              By: */s/ Frederick S. Wermuth*

Frederick S. Wermuth
Florida Bar No.: 0184111
KING, BLACKWELL, ZEHNDER
    & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

Marc E. Elias
John Devaney*
Amanda R. Callais*
Christina A. Ford*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
jdevaney@perkinscoie.com
acallais@perkinscoie.com
christinaford@perkinscoie.com

Lilian Timmermann*
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202
Telephone: (303) 291-2300
Facsimile: (303) 291-2400
ltimmermann@perkinscoie.com

*Counsel for the Plaintiffs*
 * *Pro Hac Vice motion forthcoming*