# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

KIRK NIELSEN, MORGAN
OUTLAW, REVEL LUBIN, FELICIA
BRUCE, BARBARA DEVANE, RAY
DAVIS, DONESA JACKSON,
ALIANZA FOR PROGRESS, INC.,
FLORIDA ALLIANCE FOR
RETIRED AMERICANS, INC., and
PRIORITIES USA,

        Plaintiffs,

        v.

RON DESANTIS, in his official
capacity as Florida Governor, et al,

        Defendants.

Case No. 4:20-cv-236-RH-MJF

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................ 1

II.  BACKGROUND ......................................................................... 2

   A.  The COVID-19 pandemic has upended daily life and Florida elections. ....... 2

   B.  Florida's vote-by-mail system threatens to disenfranchise thousands of voters
      in this year's elections. .................................................................. 5

     1.  Vote-by-Mail Postage Requirement ........................................... 6

     2.  Election Day Receipt Deadline ................................................. 7

     3.  Voter Assistance Ban ............................................................ 13

III. ARGUMENT ............................................................................ 15

   A.  Plaintiffs are likely to succeed on the merits. ................................. 15

     1.  Plaintiffs are likely to succeed on their right-to-vote claim. ....................15

     2.  Plaintiffs are likely to succeed on their claim that the Election Day Receipt
        Deadline violates the Due Process Clause. ................................................21

     3.  Plaintiffs are likely to succeed on their claim that the Postage Requirement
        violates the Twenty-Fourth and Fourteenth Amendments. ......................25

     4.  Plaintiffs are likely to succeed on their claim that the Voter Assistance Ban
        violates Plaintiffs' First Amendment rights. ..............................................27

     5.  Plaintiffs are likely to succeed on their claim that the Voter Assistance Ban
        is pre-empted by Section 208 of the Voting Rights Act. ..........................29

   B.  Plaintiffs will suffer irreparable injury absent an injunction. ........................32

   C.  The balance of the equities and public interest favor an injunction. .............33

IV.  CONCLUSION ........................................................................34

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Buckley v. Am. Constitutional Law Found., Inc.*,
   525 U.S. 182 (1999) ............................................................................. 27

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ....................................................................... 15, 16

*Carillon Importers, Ltd. v. Frank Pesce Int'l Grp., Ltd.*,
   112 F.3d 1125 (11th Cir. 1997) ........................................................ 15

*Crawford v. Marion Cty. Election Bd.*,
   553 U.S. 181 (2008) ........................................................................... 16

*Democratic Exec. Comm. of Fla. v. Lee*,
   915 F.3d 1312 (11th Cir. 2019) ........................................................ 16

*Democratic Nat'l Comm. v. Bostelmann*,
   No. 20-cv-249-wmc, 2020 WL 1638374 (W.D. Wis. Apr. 2, 2020) ................. 19

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   No. 20-1538 (7th Cir. Apr. 3, 2020), ECF No. 30 ............................. 19

*Driscoll et al. v. Stapleton*,
   No. DV 20-408 (Mt. D. Ct. May 22, 2020) ........................... 8, 19, 20

*Elrod v. Burns*,
   427 U.S. 347 (1976) ........................................................................... 31

*Fla. State Conference of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) (Barkett, J., concurring and
   dissenting in part) .............................................................................. 23

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
   347 F. Supp. 3d 1251 1268 (N.D. Ga. 2018) .................................... 32

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) ............................................................................. 29

*Grayden v. Rhodes*,
   345 F.3d 1225 (11th Cir. 2003) ........................................................ 21

*Hadnott v. Amos*,
   394 U.S. 358 (1969) ........................................................................... 27

# TABLE OF AUTHORITIES

CASES                                                                  PAGE(S)

*Harman v. Forssenius*,
    380 U.S. 528 (1965)........................................................................25, 26

*Harper v. Va. State Bd. of Elect.*,
    383 U.S. 663 (1966)..............................................................................25

*Hunter v. Hamilton Cty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011)..............................................................22

*Jones et al. v. DeSantis et al.*,
    No. 4:19-cv-00300, slip op. (N.D. Fla. May 24, 2020)................25, 26

*League of Women Voters of Fla., Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ..............................16, 31, 33

*League of Women Voters of Fla. v. Browning*,
    863 F. Supp. 2d 1155 (N.D. 2012)  ....................................28, 32, 33

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014)..............................................................32

*M.L.B. v. S.L.B.*,
    519 U.S. 102 (1996)..............................................................................25

*Martin v. Kemp*,
    341 F. Supp. 3d 1326 (N.D. Ga. 2018*), appeal dismissed sub nom.*
    *Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL
    7139247 (11th Cir. Dec. 11, 2018)....................................................22

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..............................................................................21

*Meyer v. Grant*,
    486 U.S. 414 (1988)..............................................................................27

*Middleton v. Andino*,
    No. 3:20-cv-01790, ECF No. 31 (D.S.C. May 25, 2020)................20

*Minnesota v. Thao*,
    62-CR-18-827 (Minn. Dist. Ct. Oct. 23, 2018)............................30, 31

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Ne. Ohio Coal. for Homeless v. Husted*,
  696 F.3d 580 (6th Cir. 2012)...............................................................18, 20, 23

*Norman v. Reed*,
  502 U.S. 279 (1992)................................................................................16, 21

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012).........................................................................31

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017)....................................................................29, 30

*Priorities USA et al. v. Nessel*,
  No. 4:19-cv-1334, ECF No. 59 (E.D. Mich. May 22, 2020)............................28

*Project Vote, Inc. v. Kemp*,
  208 F. Supp. 3d 1320 (N.D. Ga. 2016).............................................................32

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
  762 F. Supp. 1354 (D. Ariz. 1990)..................................................................24

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
  140 S. Ct. 1205 (2020)..........................................................................8, 11, 19

*Reynolds v. Sims*,
  377 U.S. 533 (1964)........................................................................................22

*Saucedo v. Gardner*,
  335 F. Supp. 3d 202 (D.N.H. 2018) ..........................................................22, 24

*Tashjian v. Republican Party of Conn.*,
  479 U.S. 208 (1986)..................................................................................27, 28

*Taylor v. Louisiana*,
  419 U.S. 522 (1975)................................................................................17, 32

*Williams v. Rhodes*,
  393 U.S. 23 (1968)..........................................................................................28

## STATUTES AND OTHER AUTHORITIES

52 U.S.C. § 10310(c)(1)......................................................................................30

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

52 U.S.C.A. § 10508 ................................................................29

Fla. Stat. § 101.6103(2) ...........................................................7

Fla. Stat. § 101.62 .................................................................5

Fla. Stat. § 101.64 .................................................................7

Fla. Stat. § 101.65 .................................................................5

Fla. Stat. § 101.67(2) .............................................................7

Fla. Stat. § 102.112 ...............................................................19

Fla. Stat. § 104.041 ...............................................................20

Fla. Stat. § 104.061(1) ............................................................20

Fla. Stat. § 104.0616 ..............................................................13

Fla. Stat. § 104.0616(2) ...........................................................29

Fla. Stat. §101.6952 ...............................................................18

S. Rep. No. 97-417 (1982) .........................................................30

Voting Rights Act Section 208 ....................................... 28, 29, 30, 31

## I.   INTRODUCTION

The August 18, 2020 primary ("August Primary") and November 3, 2020 general ("November Election") are mere months away, and Florida's Supervisors of Elections ("Supervisors") are sounding the alarm about the challenges they will face in this public health crisis: a severe shortage of polling locations, poll workers, and supplies, all of which will make it difficult to conduct in-person voting as Florida has done in the past. To avoid packing voters into a few, consolidated polling locations—a strategy which resulted in disenfranchisement, hours-long lines, and the spread of COVID-19 in Wisconsin's recent primary—Florida's Supervisors are encouraging voting by mail and expecting voters will do so at unprecedented rates.

As Florida voters overwhelmingly turn to voting by mail, however, several provisions of Florida law threaten voters' ability to successfully exercise their right to vote. *First*, Florida requires voters to bear the burden and cost of postage to vote by mail ("Vote-by-Mail Postage Requirement"). *Second*, Florida does not count vote-by-mail ballots that arrive after 7 p.m. on Election Day, even if the ballot was mailed before Election Day ("Election Day Receipt Deadline" or "Receipt Deadline")—a provision that disenfranchised over 15,000 voters in 2018, even before a pandemic induced an increase in mail voting and increased pressure on a struggling postal service. *Third*, Florida prohibits trained, paid organizers or

campaign staff from assisting voters with their mail ballots—the very persons best positioned to assist voters in successfully navigating the vote-by-mail process ("Voter Assistance Ban") (collectively, the "Challenged Provisions").

Even under ordinary circumstances, the Challenged Provisions burden all Florida voters and many severely so. During the ongoing pandemic—when voting by mail has become the "fail safe" for accessing the franchise—these provisions are even more unjustifiable. If left in place, they will disenfranchise thousands more this year.

Plaintiffs move for preliminary injunctive relief to protect their rights and the rights of millions of Florida voters who will vote in the upcoming elections.

## II.   BACKGROUND

### A.   The COVID-19 pandemic has upended daily life and Florida elections.

A novel coronavirus is spreading through the country, with more than 50,000 known infections in Florida, and over 2,000 documented fatalities—more than 80% of which were from Floridians aged 65 and older and, in central Florida, a disproportionate number of whom were Hispanic. Ex. 2 ¶¶21-23 (Ball Rpt.).[1] These numbers continue to rise and are likely severely undercounted. *See* Exs. 21, 22. Projections show the crisis persisting into the fall; social distancing may be

---

[1] All exhibit numbers correspond to the exhibits attached to the Notice of Filing Exhibits in Support of Plaintiffs' Motion for Preliminary Injunction. ECF No. 88.

required for 18 more months, until a vaccine is developed and distributed. *See* Ex. 2 ¶¶26-28 (opining to "multiple waves" in the fall and continued social distancing); Ex. 23 (federal government projection); Ex. 24 (scientists' projection). As the Director of the Centers for Disease Control and Prevention ("CDC") and other experts recently cautioned, this fall is likely to see another wave of infections that may "be even more difficult than the one we just went through." Ex. 25; *see also* Ex. 2 ¶28. Even as Florida's leaders have allowed the state to partially reopen, many have elected to stay home fearing the virus' threat to their health. *See* Ex. 26. And for good reason: "20.5% of Florida's population is comprised of people who are 65 or older, which is one of the largest senior citizen populations in the country." Ex. 2 ¶22. This demographic heightens the fatality risk in Florida. *Id.*

Beyond posing a direct threat to Floridians' health, the pandemic is also upending elections. *See* Ex. 2 ¶29 (discussing risk of exposure in elections). On March 17, 2020, in the pandemic's early stages, Florida held a presidential preference primary election ("March PPP"). While voters waited to vote clad in gloves and masks, Supervisors encountered significant challenges: polling locations were unavailable, hand sanitizer and other materials were in short supply, and a substantial numbers of poll workers—most over 65 and at high risk for experiencing severe cases of COVID-19—cancelled at the last minute. *See* Ex. 27; *see also* Ex. 2 ¶22. In Palm Beach County, over 800 poll workers backed out

shortly before the election due to coronavirus. *See* Ex. 28. And, after the election, two poll workers in Broward County tested positive for COVID-19. *See* Ex. 29. The CDC, anticipating such difficulties in conducting elections, is recommending voting by mail to reduce the spread of COVID-19 and reducing methods of voting that lead to direct contact with other voters and poll workers. *See* Ex. 30; *see also* Ex. 2 ¶28 (discussing social distancing at polling locations and need for high-risk individuals to limit in-person voting).

Understanding these challenges, Florida's Supervisors recently sent a letter to Governor DeSantis explaining the difficulties administering in-person voting in the March PPP and anticipating "that these challenges will continue and likely will impact the August [Primary] and the November [Election]." Exs. 27, 31. While Florida has now requested more than $20-million in available federal funds for pandemic-related election support, *see* Ex. 32, it has yet to take meaningful steps to adequately prepare for the anticipated surge in mail voting this year.

Historically, 70% of Florida's voters have typically voted in person. *See* Ex. 1 ¶61 (Herron Rpt). But like other states that have experienced historic absentee turnout since the pandemic began, *see id.* ¶42, Florida will see significant increases in mail voting in the upcoming elections due to COVID-19—much of it by first-time mail voters. *See id.* ¶¶43, 64; Exs. 33, 34 (Supervisors expect "a huge increase in mail-in ballots" and are affirmatively sending mail ballot request forms to

voters); Ex. 20 ¶5 (State Senator anticipating constituents switching to vote-by-mail); Ex. 12 ¶¶3-4 (in-person voter plans to vote by mail for the first time); Ex. 8 ¶¶3-5; Ex. 14 ¶¶9, 11. The prospect of an exponential increase in mail ballots is even more harrowing in Florida—even without such increases, Supervisors have failed to send scores of mail ballots to voters on time, raising concerns that similar delays may hamper the ability of Floridians to vote-by-mail this year. Ex. 1 ¶¶114-116.

**B.   Florida's vote-by-mail system threatens to disenfranchise thousands of voters in this year's elections.**

All Florida voters have the right to vote by mail. *See* Fla. Stat. § 101.62. Under normal circumstances, mail ballots are essential for voters whose disabilities, work schedules, family care responsibilities, health conditions, or lack of easy access to transportation or polling places make in-person voting difficult or impossible. During the pandemic, mail voting has become essential for all voters who seek to protect their health and safety. *See* Ex. 2 ¶28; Ex. 30. But switching to voting by mail is not easy: just as the pandemic was beginning, first-time mail voters (who had voted successfully in-person in prior general elections) were three times more likely to have their mail ballot rejected than experienced mail voters were. Ex. 1 ¶175. In particular, the Challenged Provisions impose significant burdens on the ability of Floridians to successfully vote by mail during the pandemic.

### 1. Vote-by-Mail Postage Requirement

Florida requires vote-by-mail ballots to have sufficient postage to reach their Supervisor's Office. Fla. Stat. § 101.65. While some Florida counties have historically picked up the tab for voters, most have not. *See, e.g.*, Ex. 35 (Escambia: mail ballots "require a $.50 first-class postage stamp"); Ex. 36 (Citrus: "VBM ballots . . . will require $.50 postage"); Ex. 37 (Clay: "[p]lace a postage stamp on the return envelope").

The Postage Requirement imposes monetary and transaction costs on voting. The actual cost to vote via mail ballot starts at $0.55 for a USPS Forever Stamp but can increase if the ballot is several pages long, requiring more postage. *See, e.g.*, Ex. 38 (requiring $1.50 in postage). This cost is not insubstantial; in the 2017 Postal Omnibus Survey, approximately a quarter of respondents considered the then $0.49 Forever Stamp to be "expensive." Ex. 39. Moreover, voters do not always have stamps. Unless the voter can order a sheet of stamps online, pay for shipping costs, wait 7-10 days for delivery, or has access to a stamps.com account and printer, *see* Ex. 1 ¶39; Ex. 40, obtaining postage requires the voter to go in person to a post office or another business that sells stamps. *See* Ex. 1 ¶39. For voters who are elderly, disabled, live far from a post office, or have limited access to transportation, the Postage Requirement imposes significant transaction costs on casting a mail ballot and may deter voting. *See id.* ¶¶70-72.

The Postage Requirement imposes an even greater burden during the pandemic. As unemployment skyrockets, the Postage Requirement creates obstacles to voting for Floridians now facing financial concerns over housing, food, and other essentials, including millions who have applied for unemployment benefits since the pandemic began. *See* Ex. 41. As an increasing number of voters find themselves in desperate economic situations, the cost of stamps is not inconsequential. *See* Ex. 1 ¶¶76-77; Ex. 13 ¶¶8-9; Ex. 39.

The crisis is also exacerbating the ancillary burdens of obtaining postage. Obtaining postage requires voters to break social-distancing protocol and engage in in-person interactions that risk spreading or contracting COVID-19. *See* Ex. 1 ¶137; Ex. 2 ¶26. Given that many voters requesting mail ballots will do so precisely because they concerned for their own health or the health of loved ones, they will be far less able to venture out to purchase stamps if they do not already have them. *See* Ex. 5 ¶6; Ex. 8 ¶6. Thus, such voters will be delayed in returning their ballot or unable to return their ballot by mail.

## 2.  Election Day Receipt Deadline

Even if voters successfully navigate the Postage Requirement, Florida does not count mail ballots received after 7:00 p.m. on Election Day. *See* Fla. Stat. §§ 101.67(2), 101.6103(2), and 101.64. This means that, regardless of the date the voter mails the ballot, the voter's ballot will not be counted if it arrives after the

Deadline, even if is postmarked by Election Day and even if its late arrival is entirely beyond the voter's control.

As more voters turn to voting by mail and the potential for mail delays grows, courts, including the Supreme Court, are recognizing that Receipt Deadlines must be enjoined, and states ordered to accept—and count—ballots mailed by Election Day to prevent widespread disenfranchisement. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1208 (2020); Ex. 59 (showing imposition of a postmark deadline resulted in over 80,000 voters' ballots being counted that would have been discarded under an Election Day Receipt Deadline); Ex. 58, *Driscoll et al. v. Stapleton*, No. DV 20-408 (Mt. D. Ct. May 22, 2020) (preliminarily enjoining Montana's Receipt Deadline and recognizing that such a deadline is likely to disenfranchise thousands of voters).

Florida's Receipt Deadline, like Wisconsin's or Montana's, regularly disenfranchises thousands of voters—even before the pandemic. In the 2018 General Election, more than 15,000 ballots were discarded because they arrived after the Deadline. Ex. 1 ¶85. The Deadline is particularly likely to disenfranchise young voters, *see id.* ¶¶91-93, many of whom are attending school out-of-state and whose ballots correspondingly take longer to reach them and then be delivered back to Florida. *See* Ex. 4 ¶¶3-6 (student disenfranchised in two consecutive general elections by Receipt Deadline); Ex. 10 ¶¶6-11 (disenfranchised by

Deadline); Ex. 9 ¶¶5-7 (same); Ex. 19 ¶¶5-6. Overall, in the 2018 General Election, the Deadline was approximately eight times likelier to disenfranchise voters under 26 than 60-year-old voters. *See* Ex. 1 ¶93. But the Deadline also disenfranchises significantly older voters (*i.e.*, those 75 and older), *see id.* ¶95—a population that is more likely to have difficulty returning a ballot in-person compared to their relatively younger counterparts, particularly during the pandemic. The figure below demonstrates this trend:

Figure 2: Late VBM ballot rates and age



(a) 2018 GE

Ex. 1 at ¶91. The Receipt Deadline is also twice as likely to disenfranchise Hispanic voters compared to White voters. *Id.* ¶¶89-90. Moreover, the number of voters disenfranchised by the Receipt Deadline has persisted (and even worsened) over time. *See id.* ¶¶85-87 (rate of late ballots increased from the 2016 General Election to the 2018 General Election to the March PPP).

The Receipt Deadline disenfranchises an increasing number of voters in part because USPS has eliminated hundreds of processing centers, leading to longer mail delivery times and delays—a fact well-known to Florida's Supervisors. *See* Ex. 42 (USPS "has been systematically closing numerous regional processing centers . . . result[ing] in delays of several days, in some cases, in moving VBM ballots from Point A to Point B"); Ex. 18 ¶10 (former Supervisor recognizing ballots take longer to be delivered); Ex. 20 ¶8.

USPS now recommends that voters mail their ballots a full *week before* Election Day. *See* Ex. 43. Some counties, like Pinellas County, have communicated this "cutoff" to voters. *See* Ex. 44 ("PLEASE NOTE: Postal delivery service has changed. Voters are advised to allow at least ONE WEEK for their ballot to be returned by mail."). But many counties have suggested far less time for return. *See, e.g.,* Ex. 45 (Collier County recommending two days); Ex. 46 (Citrus recommending three to five days). Other counties fail to provide guidance on this timing. *See, e.g.*, Ex. 47 (St. Lucie County instructing, "you may vote your

ballot at your leisure—in the comfort of your home—and return it by mail or hand deliver, no later than 7:00 pm on Election Day"). A patchwork of confusing suggestions results, largely failing to give voters adequate notice to mail their ballot *significantly* before Election Day.

But the disenfranchisement resulting from the Receipt Deadline is more than a messaging problem. The Deadline also disenfranchises voters who have mailed their ballots significantly before Election Day. *See* Ex. 3 ¶¶4-10 (Broward voter disenfranchised by Receipt Deadline despite mailing ballot eight days before Deadline); Ex. 11 ¶5. Worse yet, countless voters simply cannot meet the Receipt Deadline because they are not sent a ballot with adequate time to return it. Ex. 1 ¶¶114-117; Ex. 9 ¶¶3-6 (received mail ballot the evening before Election Day, despite requesting it over a month before election); Biggs Decl. ¶ 8 (received mail ballot only a few days before Election Day). These are not isolated incidents. In 2018, Florida counties sent almost 10,000 mail ballots to voters after the statutory cutoff for sending out ballots, giving voters inadequate—or no time at all—to return ballots by the Deadline.[2] Ex. 1 ¶¶110, 117. Similarly, Supervisors sent more than 11,000 mail ballots after the statutory cutoff in the March PPP. *See id* ¶114-117. Florida's Receipt Deadline has disenfranchised and will continue to

---

[2] When a voter's ballot does not arrive in time to be counted, many counties fail to notify the voter, meaning that voters have no indication to mail their ballot earlier in the next election. *See, e.g.*, Ex. 48 (Miami Dade: "[n]o notifications are sent to voters whose ballot arrives after Election Day"); Ex. 49 (no notification for St. Lucie voters).

disenfranchise voters who are simply "in line" to receive ballots, but who cannot ensure their ballots' receipt by Election Day. *See Republican Nat'l Comm*., 140 S. Ct. at 1211 ("If a voter already in line by the poll's closing time can still vote, why should [a state's] absentee voters, already in line to receive ballots, be denied the franchise?") (Ginsburg, J., dissenting from stay).

This year's anticipated surge of mail ballots will put an unprecedented strain on this entire system. The Supervisors, who struggle to meet the demand for mail ballots under normal circumstances, have already asked the Governor to suspend the provision of law requiring them to mail a ballot within 2 business days of receiving a request, seeking more time to complete those requests. *See* Ex. 27. This surge of mail ballots also threatens to overwhelm USPS, which is suffering from severe budgetary shortfalls, staffing shortages, and reduced capacity. *See* Ex. 50. The consequences of these issues are already playing out across the country. As a result of staff shortages, overwhelming requests for mail ballots, and USPS breakdowns, thousands of Wisconsin voters did not receive their requested ballots in time to vote in the state's recent primary election. *See, e.g.*, Ex. 51 (referencing "numerous reports of absentee ballots not being delivered" in time). More recently, Ohio's Secretary of State wrote to congressional leaders about similar postal delays in Ohio's April primary election. *See* Ex. 52 (reporting mail delays as long as 7 to 9 days).

For all these reasons, it is nearly certain that the Receipt Deadline will disenfranchise substantial numbers of lawful Florida voters who vote by mail during the pandemic. Indeed, just as this crisis was beginning, Florida election officials discarded nearly 9,000 mail ballots in the March PPP for arriving after the Receipt Deadline. Ex. 1 ¶85. Should the Receipt Deadline remain in place for the November Election, expert analysis conservatively estimates that if mail voting occurs at the same rate as it did in the March PPP, anywhere from 21,073 to 54,348 voters will be disenfranchised by the Deadline. *See id.* ¶¶193-199. However, if the rate of mail voting increases consistent with other states that have held elections during later periods of the pandemic, anywhere from 33,175 to 96,405 voters will be disenfranchised. *See id.* at Table 18.

### 3.  Voter Assistance Ban

The staggering number of voters that Florida's Receipt Deadline consistently disenfranchises shows that voters need assistance returning their ballots. This assistance is crucial for voters for whom personally returning their ballot in person (particularly if received too late to mail back) will impose significant burdens— including voters who are themselves or who have close contact with someone vulnerable to COVID-19, voters with disabilities, low-income voters, and young voters, many of whom lack easy access to reliable transportation. *See* Ex. 1 ¶¶ 13-14, 40, 47. Florida law, however, largely limits voters' delivery assistance options

to "immediate family," criminalizing the receipt of "a pecuniary or other benefit" for assisting voters with absentee ballots unless the voter is an "immediate family member," i.e., spouse, parent, child, grandparent, or sibling. Fla. Stat. § 104.0616. As a result, paid, trained professionals, such as campaign staff or community organizers, may not assist a voter in returning their ballot without risking criminal prosecution. *See* Ex. 53 (instructing that "[a] paid campaign worker collecting absentee ballots from voters <u>would</u> violate the law").

Even under normal circumstances, the Ban makes it needlessly difficult for certain voters to receive help, especially those who live alone or have no family members willing and able to deliver ballots. *See* Ex. 5 ¶¶3, 5; Ex. 8 ¶8; Ex. 6 ¶7; *see also* Ex. 1 at ¶¶99, 202-203 (explaining voters who indicate they "need assistance voting" are disparately disenfranchised). Help with returning ballots is also especially needed in minority communities, which face greater rates of disenfranchisement from the current Receipt Deadline, may be unfamiliar with voting by mail, and stand to benefit the most from organized assistance from community organizers. *See id.* ¶161, 220-221; Ex. 14 ¶¶14-15; Ex. 14 ¶¶11-12; Ex. 20 ¶11.

The Voter Assistance Ban presents even greater obstacles in the ongoing pandemic. Volunteers who previously assisted voters, or family members who previously assisted with hand-delivering mail ballots, are understandably no longer

willing to do so out of safety concerns. *See* Ex. 6 ¶8; Ex. 7 ¶¶3-4; Ex. 13 ¶8. With the expected surge in mail voters, particularly from voters who are most vulnerable to COVID-19, voters will need help from organizations who are ready, willing, and able to deploy trained, paid organizers to ensure their ballots are returned in time to be counted. *See* Ex. 15 ¶¶14-15; Ex. 16 ¶¶12-13; Ex. 14 ¶12. Beyond returning ballots, trained professionals can also remind voters to sign their ballots—a misstep that unintentionally disenfranchises thousands each year, and is particularly likely to disenfranchise first-time mail voters. Ex. 1 ¶177. Florida's Voter Assistance Ban, however, prevents organizations from deploying that help.

## III.   ARGUMENT

Plaintiffs are entitled to a preliminary injunction because: (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable harm absent relief; (3) the harm they will suffer outweighs harm the Defendants will suffer because of an injunction; and (4) an injunction is in the public interest. *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp., Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997).

## A.   Plaintiffs are likely to succeed on the merits.

### 1.  Plaintiffs are likely to succeed on their right-to-vote claim.

The Challenged Provisions unduly burden Florida voters' right to vote by imposing multiple barriers to casting a vote-by-mail ballot that are unjustifiable,

particularly during the present unprecedented public health crisis.

Under the *Anderson/Burdick* balancing test, courts must "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)). This inquiry is highly fact-specific and may not be undertaken by rote. Rather, the court applies a "flexible standard." *Id.* "The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318, 1319 (11th Cir. 2019)

When voting rights are severely restricted, a law "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). But even less severe burdens remain subject to balancing: "However slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89). In evaluating the burden, a court must focus not only on the burden on the general electorate, but also the burden on the

actual individuals affected by the law. *Id.* at 201. "Disparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216-20 (N.D. Fla. 2018). Finally, disenfranchisement severely burdens the right to vote—and disenfranchisement of even small numbers of voters constitutes an undue burden. *See Lee*, 915 F.3d at 1321 (finding an undue burden under *Anderson-Burdick*, and recognizing "[i]t is a 'basic truth that even one disenfranchised voter—let alone several thousand—is too many'") (quoting *League of Women Voters of N.C. v. North Carolina ("LOWV NC")*, 769 F.3d 224, 244 (4th Cir. 2014)).

Under this framework, each of the Challenged Provisions separately and cumulatively inflicts undue burdens on Plaintiffs' and countless other Floridians' voting rights that cannot be justified by Florida's interests in imposing them.

*First*, the Vote-By-Mail Postage Requirement imposes monetary costs on voters to cast a mail ballot, a burden that is particularly severe this year, when mail voting is likely to be many voters' only safe method of exercising their right to vote. *Supra* at 4-5. It also forces voters to risk their health to obtain postage at a post office or other location, deterring voters with disabilities, limited access to transportation, and concerns about contracting COVID-19 from voting. *Supra* at 6-7. The State has no adequate justification for failing to pre-pay postage for such ballots. Its failure to do so is purely a matter of administrative convenience, which

cannot outweigh burdens on fundamental rights. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975). Moreover, Congress has allocated $20 million for Florida to use for coronavirus-related election expenses, which can be used to cover the cost of prepaying postage. *See* Exs. 32, 54.

*Second*, even before the onset of the pandemic, the Election Day Receipt Deadline severely burdened the right to vote by disenfranchising *thousands* of eligible voters—including more than 15,000 in 2018 alone—who mail their ballot on or before Election Day, simply because their ballots do not arrive by 7:00 p.m. on Election Day. *Supra* at 8. For those voters who, through no fault of their own, do not receive a mail ballot until shortly before Election Day, or whose ballots take longer than expected to arrive in the mail, the punishment is swift and severe: total disenfranchisement. Further the Receipt Deadline is disproportionately likely to disenfranchise Florida's young, minority, elderly, and disabled voters—some of the very voters most likely to resort to mail voting during a pandemic. *Supra* at 8-9. The number of voters disenfranchised by the Receipt Deadline is all but certain to increase as Supervisors and USPS are crushed under a surge of requests for mail ballots. *Supra* at 12. This is precisely what Florida saw in the March PPP, near the beginning of the COVID-19 crisis. Rejection rates increased from the 2018 General Election to the March PPP, demonstrating that far more voters are likely to be disenfranchised in the upcoming elections. *Supra* at 9. Plaintiffs' expert

estimates that, at a minimum, the Receipt Deadline will disenfranchise tens of thousands voters in the November Election. *Supra* at 12.

The State has no adequate justification for discarding these mail ballots. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) ("*NEOCH*") (finding likely constitutional violation after state failed to identify "precise interests" justifying "substantial burden" when ballots were rejected due to no fault of the voter). Florida already accepts the ballots of military and overseas voters that are mailed by Election Day and arrive within ten days of the election. *See* Fla. Stat. §101.6952. Plaintiffs and Florida voters should be entitled to the same allowances, particularly during a global pandemic when stateside voters face many of the same hurdles UOCAVA voters do in returning their ballots. Moreover, because Florida need not finalize its election results for 12 days after the election, *see* Fla. Stat. § 102.112, extending the deadline to receive ballots would not jeopardize the State's ability to finalize election results. *See* Ex. 18 ¶¶ 14-16; *see also* Ex. 58, *Driscoll*, at *11 (finding no adequate state interest in maintaining a Receipt Deadline where postmark deadline would not frustrate timely election results certification).

Wisconsin's recent experience is instructive: Last month, a Wisconsin federal court extended the deadline for receipt of absentee ballots because voters were at risk of being disenfranchised by Wisconsin's Election Day Receipt

Deadline. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 1638374, at *5, *12, n.14 (W.D. Wis. Apr. 2, 2020). The court concluded that "the state's general interest in the . . . deadline is not so compelling as to overcome the burden faced by voters who, through no fault of their own, will be disenfranchised by" its enforcement." *Id.* at *17. The Seventh Circuit affirmed. *See* Order, *Democratic Nat'l Comm. v. Republican Nat'l Comm*., No. 20-1538 (7th Cir. Apr. 3, 2020), ECF No. 30. Shortly thereafter, the Supreme Court, evaluating the extension under *Anderson-Burdick* agreed that it was appropriate to require the state to accept and count ballots mailed by Election Day, even though Wisconsin (like Florida) ordinarily rejects ballots received after Election Day. *See Republican Nat'l Comm*., 140 S. Ct. at *1208; *see also* Ex. 58, *Driscoll*, at *17 (enjoining Montana's Receipt Deadline and ordering acceptance of ballots postmarked on or before Election Day).[3] That is precisely the relief Plaintiffs seek here.

*Finally*, the Voter Assistance Ban imposes undue burdens on Florida voters, prohibiting countless voters from obtaining help in casting their mail ballot. Those without access to postage, who lack easy access to reliable transportation to get to a polling place, who are concerned about the risk in-person voting poses to their

---

[3] Although one court recently declined to enjoined South Carolina's Receipt Deadline, *see Middleton v. Andino*, No. 3:20-cv-01790, ECF No. 31 (D.S.C. May 25, 2020), the court did so after attributing late ballots to South Carolina voters' failure to submit their ballots on time. Here, Plaintiffs have presented extensive evidence that Florida voters are being disenfranchised by the Receipt Deadline for reasons outside their control, and the state cannot disenfranchise these voters in a manner consistent with the Constitution. *See NEOCH*, 696 F.3d at 597.

health or the health of their loved ones, and who do not have family member who can assist them, will be unable to return their ballot. *See supra* at 13-14. These burdens disproportionately fall on Florida's minority voters and vulnerable populations. *See id.* A generalized interest in promoting "election integrity" is insufficient to outweigh these burdens, particularly where *many* other Florida laws already criminalize any exercise of undue influence or voting fraud that might be captured by the Voter Assistance Ban. *See, e.g.,* Fla. Stat. §§ 104.041, 104.061(1).

Crucially, the Challenged Provisions do not operate in a vacuum—they instead build upon each other, cumulatively burdening Florida voters. The time spent obtaining postage, for example, makes it more likely that a voter will mail their ballot later and, therefore, that their ballot will be rejected for arriving late. Likewise, voters unable to obtain postage are more likely to need assistance and without such assistance are at risk that their ballot may not arrive on time.

Finally, even if this Court determines that any of the Challenged Provisions impose minimal burdens on the right to vote, it must still consider whether Florida's interests are "sufficiently weighty" to impose those burdens. *Norman*, 502 U.S. at 288–89. There are no state interests sufficient to outweigh these increasing burdens on Floridians' voting rights, particularly during a pandemic.

### 2. Plaintiffs are likely to succeed on their claim that the Election Day Receipt Deadline violates the Due Process Clause.

The Receipt Deadline deprives Florida voters, including Plaintiffs, of their

21

liberty interest in voting without adequate procedural safeguards. The Due Process Clause prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 1. Which protections are due requires a careful analysis of the importance of the rights and other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). In determining whether the state has provided adequate process, courts must consider (1) "the private interest" affected, (2) "the risk of an erroneous deprivation" of that interest through current procedures, and (3) the "probable value . . . of additional or substitute procedures," accounting for the "administrative burdens" such procedures would entail. *Grayden v. Rhodes*, 345 F.3d 1225, 1233 (11th Cir. 2003) (quoting *Mathews*, 424 U.S. at 335).

These factors weigh heavily in Plaintiffs' favor. *First*, the nature of the private interest here—voting and having one's ballot counted—is extraordinarily important. *See Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) ("There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted.") (citation and quotation omitted). This interest extends to mail voting, which Florida has statutorily conferred upon its citizens. *See, e.g.*, *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018*), appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th

Cir. Dec. 11, 2018); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018).

*Second*, the risk of erroneous deprivation from the Receipt Deadline is extraordinarily high. This deprivation is neither hypothetical nor speculative; public data from Florida establishes that thousands of voters' mail ballots have been rejected every election cycle, including more than 15,000 ballots in the 2018 General Election and nearly 9,000 in the March PPP. *Supra* at 8, 12. The "cutoff" to mail a ballot is a moving target that varies between counties and elections, and depends on USPS's state, *supra* at 10, making it patently unreliable and confusing. "To disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011).

Florida's existing procedures therefore deprive voters of having their ballot counted because (1) many voters cannot accurately ascertain when they must return their ballot by mail, (2) even voters who can ascertain this "cutoff" are disenfranchised if their ballots do not arrive at the Supervisor's office on time, through no fault of their own, and, most importantly, (3) a substantial number of voters do not receive their mail ballots in time to return them by the "cutoff," depriving them of the opportunity to vote, particularly during the pandemic where in-person voting may not be a safe option. *Supra* at 4, 8-12; *see also NEOCH*, 696 F.3d at 591 ("[T]he unreasonableness and fundamental unfairness of disqualifying

wrong-precinct ballots caused by poll-worker error" is a "likely constitutional violation[ ] . . . requiring injunctive relief.").

Florida's current procedures are neither a fair nor reliable way to administer voting by mail. A state's elections system, "the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter's [ability to vote] and that fails to give voters a fair opportunity to [participate], is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (Barkett, J., concurring and dissenting in part). Worse still, once a voter's ballot arrives after the Receipt Deadline and their liberty interest is deprived, "the election procedures do not give some form of post-deprivation notice to the affected individual so that any defect in eligibility can be cured and the individual is not continually and repeatedly denied so fundamental a right." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990); *see supra* at 11 n.2 (many counties do not notify voters about late ballots).

*Third*, the value of additional or substitute procedural safeguards to ensure that Florida's mail voters' votes are counted is readily apparent. A substitute procedure—requiring Florida to count vote-by-mail ballots that are mailed on or before Election Day and received within ten days thereafter solves the inequities

inherent in Florida's Receipt Deadline. A postmark deadline not only offers Florida voters a reliable date by which they must cast their ballots, it also ensures that voters who receive their ballots just a few days before Election Day are able to engage in the franchise. *See* Ex. 1 ¶124 (showing 99% of late ballots in the March PPP arrived by Day 10). Requiring Florida to count these ballots imposes little administrative burden on the state. *Supra* at 19.

Having conferred the right to vote by mail, Florida must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. *Cf. Saucedo*, 335 F. Supp. 3d at 217. Because Florida's Receipt Deadline is inadequate in all those respects, and Florida can institute a substitute procedure which would protect voters' rights with minimal burden to the state, the Receipt Deadline violates Florida voters' procedural due process rights.

### 3. Plaintiffs are likely to succeed on their claim that the Postage Requirement violates the Twenty-Fourth and Fourteenth Amendments.

Plaintiffs are likely to succeed on their Twenty-Fourth Amendment claim. That Amendment provides that the right to vote "shall not be denied or abridged by the United States or any state by reason of failure to pay any poll tax or other tax," *see* U.S. Const. amend. XXIV, § 1; *see also Harman v. Forssenius*, 380 U.S. 528 (1965); *Jones et al. v. DeSantis et al.*, No. 4:19-cv-00300, slip op. at 73 (N.D. Fla. May 24, 2020) (holding the Twenty-Fourth Amendment "applies not just to any

poll tax but also to any 'other tax.'"). Similarly, the Fourteenth Amendment prohibits the imposition of fees on the franchise. *See Harper v. Va. State Bd. of Elect.*, 383 U.S. 663, 666 (1966). "[V]oting cannot hinge on ability to pay . . . for it is a 'fundamental political right . . . preservative of all rights.'" *M.L.B. v. S.L.B.*, 519 U.S. 102, 124 n.14 (1996) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). This analysis is the same regardless of whether a voter is able to pay or not. *See Harper*, 383 U.S. at 668 (finding imposition of a fee unconstitutional "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all").

Florida does what *Harper* prohibits: condition casting a mail ballot on paying a fee (i.e., postage). Unlike incidental voting costs, such as the gas money used to reach a polling place, Defendants represent that postage is *required* to cast a ballot by mail. *See supra* at 5-6.

As this Court has recognized, fees imposed in the voting process violate the Twenty-Fourth Amendment if they otherwise function as taxes, *see Jones*, at *73, and courts must use a "functional approach" to determining whether a fee is a "tax," *see id.* at *73-74 (*citing Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-66 (2012)). The "essential feature of any tax" is that "i[t] produces at least some revenue for the Government." *Id.* USPS stamps are, of course, one of the primary streams of revenue for the Postal Service, raising billions of dollars for the

agency each year. *See* Ex. 55; *see also* Ex. 56 ("The Postal Service relies on the sale of postal products . . . to fund our operations"). While such a fee is unconstitutional under any circumstance, during this pandemic, where in-person voting is dangerous to voters' health and safety, paying for postage has become a prerequisite for voting. Florida voters—and particularly low-income, disabled, or homebound voters due to COVID-19—are forced to pay "a price for the privilege of exercising the franchise." *Harman*, 380 U.S. at 539. The Postage Requirement therefore violates both the Twenty-Fourth and Fourteenth Amendments.

### 4. Plaintiffs are likely to succeed on their claim that the Voter Assistance Ban violates Plaintiffs' First Amendment rights.

The Voter Assistance Ban prevents Plaintiffs from engaging in election-related speech and associational activities aimed at encouraging voters to participate in the political process—activity protected by the First Amendment. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999); *Meyer v. Grant*, 486 U.S. 414, 421 (1988). Cases involving "limitation[s] on political expression [are] subject to exacting scrutiny." *Meyer*, 486 U.S. at 420. Just as the Supreme Court struck down as an unconstitutional restriction of political expression Colorado's criminalization of paying circulators to collect petition signatures, *see id.* at 428, Florida cannot criminalize paying trained individuals to help voters return their ballots. This burdens speech by "limit[ing] the number of voices who will convey [Priorities USA and Alianza's] message," and "the size of

the audience they can reach." *Id*. at 422-23. Given the current crisis, the form of speech that Priorities USA and Alianza seek to engage in is "the most effective, fundamental, and [likely] economical avenue of political discourse," yet it is directly foreclosed by the Ban. *Id*. at 424; *see* Ex. 16 ¶12 ("[T]hese efforts are crucial for engaging voters in the political process [and particularly needed for] voters in historically marginalized communities."); Ex. 14 ¶12; Ex. 15 ¶14-15.

The Ban is also an unconstitutional restriction on Plaintiffs' right to associate. First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969). An organization's "attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968). In *Tashjian*, the Supreme Court invalidated a prohibition that "limit[ed] the Party's associational opportunities at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." 479 U.S. at 216.

Similarly, the Voter Assistance Ban limits Plaintiffs' associational opportunities by barring them from deploying trained, paid professionals to assist their constituents in returning—and reminding voters to sign—their ballots. These

include Plaintiffs who "wish to speak and act collectively with others, implicating the First Amendment right of association. More importantly, the plaintiffs wish to assist others with the process of [participating in the franchise] and thus, in due course, voting." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. 2012) (Hinkle, J). This Court has recognized that soliciting and assisting with voter registration applications is "core First Amendment activity." *Id*. at 1158. The First Amendment surely extends to the endpoint of those applications—helping voters with their ballots. *See Priorities USA et al. v. Nessel*, No. 4:19-cv-1334, ECF No. 59 at *28-32 (E.D. Mich. May 22, 2020) (holding that assisting voters with their absentee ballots is protected First Amendment activity).

**5. Plaintiffs are likely to succeed on their claim that the Voter Assistance Ban is pre-empted by Section 208 of the Voting Rights Act.**

The Voter Assistance Ban conflicts with Section 208 of the Voting Rights Act (VRA) by restricting certain voters' ability to select the person of their choice to help them vote. Conflict preemption occurs (1) when it is impossible to comply with state and federal law, or (2) "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 109 (1992) (internal quotation marks omitted). Both are true here.

Section 208 states "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." 52 U.S.C.A. § 10508. It permits only two limitations on that choice: voters cannot select (1) their employer or its agent or (2) an officer or agent of their union. *Id.* But Florida's Ban adds another limitation: a voter cannot choose someone to assist them who is receiving any compensation or "other benefit" for doing so, such as campaign staff or paid community organizers. Fla. Stat. § 104.0616(2). Because the VRA promises voters freedom of choice and the Ban restricts that choice, the laws cannot coexist.

Florida's Ban would not be the first voter-assistance restriction the VRA preempts. *See, e.g.*, *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614-15 (5th Cir. 2017) (holding VRA preempted Texas's requirement that an assistor be registered in the voter's county because it "impermissibly narrows the right guaranteed by Section 208"); Ex. 57, *Minnesota v. Thao*, 62-CR-18-827 (Minn. Dist. Ct. Oct. 23, 2018) (holding Section 208 preempts Minnesota's prohibition on candidates assisting voters).

Section 208 gives voters the unencumbered right to select who will assist them in *all actions necessary to vote*. The VRA is clear:

> The terms "vote" or "voting" shall include all action necessary to make a vote effective . . . including, but not limited to, registration, . . . or other action required by law prerequisite to voting, casting a ballot, and having

30

> such ballot counted properly and included in the appropriate totals of votes cast.

52 U.S.C. § 10310(c)(1). For mail voters, returning a ballot to an elections office for counting is by definition "action necessary to make a vote effective." *Id*. The Fifth Circuit explained that "'[t]o vote,' therefore plainly contemplates more than the mechanical act of filling out the ballot sheet . . . the definition lists 'casting a ballot' as only one example in a nonexhaustive list of actions that qualify as voting." *OCA*, 867 F.3d at 615.

Moreover, the legislative history makes Congress's intent clear. In its report on the VRA, the Senate Judiciary Committee found that state restrictions that "deny the assistance at some stages of the voting process during which assistance was needed" violate Section 208. S. Rep. No. 97-417, at 63 (1982). Section 208 therefore preempts the Voter Assistance Ban because it prohibits voters who need help from receiving assistance from the person of their choice at a crucial stage in the voting process.

The Ban also conflicts with Section 208 because it poses an obstacle to accomplishing Section 208's purpose and objective. In *Minnesota v. Thao,* the court explained that "the purpose of [the VRA] was to create as few barriers as possible to voting, with the understanding that [voters] are fully capable of determining who should serve as their trustworthy assistant." Ex. 57 at 4. The court found "the [State's] prohibition of a candidate as a possible trusted assistant acted

as an obstacle to the accomplishment of the full purpose and objective of Congress." *Id.* at 5.

By prohibiting voters covered under Section 208 from choosing whomever they want to assist them in completing or returning their ballots, the Ban creates a barrier to Section 208's purpose of ensuring voters can receive assistance from of a person of their choice. The Ban is therefore invalid.

**B.    Plaintiffs will suffer irreparable injury absent an injunction**.

The Challenged Provisions inflict several irreparable harms on Plaintiffs. *First*, they put the voter Plaintiffs and countless others at great risk of disenfranchisement, which constitutes irreparable injury. If "constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Detzner*, 314 F. Supp. at 1223. Once the election comes and goes, "there can be no do-over and no redress." *LOWV NC*, 769 F.3d at 247.

*Second*, the Challenged Provisions restrict the organizational Plaintiffs from participating in election-related activities, which courts routinely recognize as irreparable harm. *See Browning*, 863 F. Supp. 2d at 1167 (holding plaintiffs' lost opportunity to register voters was irreparable harm) (Hinkle, J.); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016).

*Third*, if the Challenged Provisions are in effect, organizational Plaintiffs

must divert resources to help their members and constituencies overcome the burdens imposed by the law and to effectuate their missions. *See* Ex. 16 ¶¶9-11; Ex. 15 ¶¶11-13; Ex. 17 ¶¶10-11. This, too, constitutes irreparable harm. *See, e.g., Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 1268 (N.D. Ga. 2018) (finding irreparable harm where "[p]laintiffs' organizational missions . . . will continue to be frustrated and organization resources will be diverted to [address the challenged law]" . . . "[s]uch mobilization opportunities cannot be remedied once lost").

## C.    The balance of the equities and public interest favor an injunction.

The balance of the equities favors Plaintiffs. While Plaintiffs face infringements of core constitutional rights, Defendants face, at most, administrative inconveniences. But "administrative convenience" cannot justify practices that impinge upon fundamental rights. *Taylor*, 419 U.S. at 535; *Kemp*, 347 F. Supp. 3d at 1268 (holding increased administrative burden on election officials "minimal compared to the potential loss of a right to vote"). An injunction is in the public interest because "[t]he vindication of constitutional rights . . . serve[s] the public interest almost by definition." *Browning*, 863 F. Supp. 2d at 1167 (Hinkle, J.); *see also Detzner*, 314 F. Supp. at 1224 ("[A]llowing for easier and more accessible voting for all segments of society serves the public interest."). Moreover, the Challenged Provisions contribute to public health risks, encouraging

voters to venture out into the world and interact face-to-face with people—despite warnings from public health officials. That risk of danger to public health is substantial, imminent, and ongoing. Issuing an injunction would give Florida voters confidence that their right to vote is preserved even in these unprecedented times, and that they will be able to safely and successfully exercise the franchise, without undue burden.

## IV.   CONCLUSION

WHEREFORE, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for preliminary injunction.

## **LOCAL RULE 7.1(F) CERTIFICATION**

Counsel for Plaintiffs, Frederick Wermuth, Esquire, certifies that this memorandum contains 7995 words, excluding the table of contents, table of authorities, and the certificate of service.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 27, 2020 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: May 27, 2020

By: */s/ Frederick S. Wermuth*
    Frederick S. Wermuth
    Florida Bar No.: 0184111
    KING, BLACKWELL, ZEHNDER
         & WERMUTH, P.A.
    P.O. Box 1631
    Orlando, FL 32802-1631
    Telephone: (407) 422-2472
    Facsimile: (407) 648-0161
    fwermuth@kbzwlaw.com

    Marc E. Elias
    John Devaney
    Amanda R. Callais*
    Zachary J. Newkirk*
    Christina A. Ford
    PERKINS COIE LLP
    700 Thirteenth St., N.W., Suite 800
    Washington, D.C. 20005-3960
    Telephone: (202) 654-6200
    Facsimile: (202) 654-9959
    melias@perkinscoie.com

jdevaney@perkinscoie.com
acallais@perkinscoie.com
znewkirk@perkinscoie.com
christinaford@perkinscoie.com

Lilian Timmermann**
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202
Telephone: (303) 291-2300
Facsimile: (303) 291-2400
ltimmermann@perkinscoie.com

*Counsel for the Plaintiffs*
*\* Pro Hac Vice motion pending*
*\*\* Pro Hac Vice motion*
*forthcoming*

1